**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ira Henderson MURPHY,**
**Defendant–Appellant.**

No. 86–6025.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 4, 1987.

Decided Jan. 4, 1988.

Rehearing Denied March 7, 1988.

Thomas E. Hansom (argued), Memphis, Debra L. Fessenden, for defendant-appellant.

W. Hickman Ewing, Jr. (argued), U.S. Atty., Memphis, Tony R. Arvin, Stephen C. Parker, for plaintiff-appellee.

Before KEITH, Circuit Judge; PECK, Senior Circuit Judge; and DOWD, District Judge.[*]

DOWD, District Judge.

Defendant-appellant Ira Henderson Murphy was convicted of eleven counts of mail fraud in violation of 18 U.S.C. § 1341, one count of obstruction of justice in violation of 18 U.S.C. § 1503, and one count of perjury before a federal grand jury in violation of 18 U.S.C. § 1623. The defendant received a sentence of five years imprisonment for each of the thirteen counts to be served concurrently and was also fined $5,000 in connection with the conviction for obstruction of justice.

## FACTUAL BACKGROUND

The defendant's convictions relate to his conduct in subverting the statutory scheme adopted by the Tennessee legislature in 1971 whereby non-profit organizations were allowed, upon application and issuance of a Certificate of Registration, to conduct bingo games for charitable purposes. The bingo licenses were processed by the Charitable Solicitation Division of Tennessee's Secretary of State Office. The defendant served in the Tennessee legislature and sponsored the legislation he subsequently manipulated by supervising the successful application of an inactive Masonic Lodge for a bingo license.

In 1982, the defendant, then a Judge of the Court of General Sessions in Memphis, Tennessee, engaged in a series of mailings to the Tennessee authorities designed to bring about the issuance of a bingo license for the H.D. Whalum Lodge No. 373. Pursuant to the state statutory scheme, the defendant provided documentation that the Lodge was tax exempt under § 501(c)(3) of the Internal Revenue Code asserting that no member of the sponsoring organization would receive profits from the bingo game, that all members conducting the bingo games were members of the sponsoring organization and had been a member for one year. The information provided by the defendant was untrue.

The initial application bore the signature of "Charles Brooks" as the person signing the application on behalf of the Lodge. The defendant notarized the signature. Subsequent renewals for the Lodge were processed and filed and included names of members active in the Lodge, even though the Lodge continued to be an inactive organization. Renewal licenses were issued and eventually the defendant permitted Ronald Smith to use the Lodge license to operate a bingo game. While Smith operated the bingo game using the Lodge license, he paid the defendant $200 a week for the use of the license. Eventually, Postal Inspector Faulkner and Special

---

[*] The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

Agent Briscoe of the I.R.S. began an investigation of Ronald Smith as an operator of a bingo game in Memphis. Their interest focused, in part, on the Whalum Lodge bingo license. As a consequence, they attempted to locate Charles Brooks as he appeared to be the primary person involved in the Whalum Lodge application. Unable to locate Brooks, Faulkner and Briscoe sought the assistance of the defendant as his name appeared as the notary on the initial application.

Faulkner and Briscoe also questioned the defendant about his possible involvement in the operation of the Whalum Lodge bingo game and the defendant denied any misconduct. The agents then located and interviewed Brooks. He denied membership in the Whalum Lodge, and denied the authenticity of his purported signatures on the Whalum Lodge applications and reports to the state. Brooks also informed the agents that he had been contacted by the defendant who had solicited his cooperation in leading the investigators and the grand jury away from the defendant's personal involvement in the bingo operation. Brooks also indicated that he had been offered $7,000 by the defendant for his cooperation. Eventually, with Brooks' consent, his conversations with the defendant were taped. In those conversations the defendant sought Brooks' cooperation and promised the payment of the $7,000.

Subsequently, the defendant appeared before the federal grand jury and after being informed that he was a subject of the investigation, denied any knowledge that signatures on documents submitted to the Tennessee authorities in support of the application for the bingo license for the Whalum Lodge were forgeries.

## I. THE INDICTMENT FAILS TO CHARGE MAIL FRAUD VIOLATIONS (18 U.S.C. § 1341) IN LIGHT OF McNALLY v. UNITED STATES.

We first address the issues relating to the convictions for mail fraud in light of the significant change in mail fraud prosecution occasioned by *McNally v. United States,* —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987).[1] Prior to *McNally,* numerous circuit court of appeals decisions[2] interpreted the mail fraud statute broadly and affirmed convictions involving schemes to defraud governments (local, state and federal), employers, unions, and citizens, of what are now commonly referred to as "intangible rights." Although § 1341[3] reads in the disjunctive, *McNally* holds that § 1341 must be read as limited in scope to the protection of property rights. In *McNally,* the Court compared the mail fraud statute with 18 U.S.C. § 371, which proscribes a conspiracy to defraud the United States and which has been interpreted broadly in its application,[4] and declared

> Section 371 is a statute aimed at protecting the Federal Government alone; however, the mail fraud statute, as we have indicated, had its origin in the desire to protect individual property rights, and any benefit which the Government derives from the statute must be limited to the Government's interest as property-holder.

*McNally,* —— U.S. at ——, n. 8, 107 S.Ct. at 2881 n. 8 (1987).

Recent decisions of the Fifth and Seventh Circuit, in the wake of *McNally,* un-

---

1. The decision in *McNally* was issued June 24, 1987. The briefs of the parties in this case had been filed previously. The case was argued before this Court on August 4, 1987. Following the argument, the Court directed postargument briefs be filed responding to issues perceived by the Court in light of *McNally.*

2. Justice Stevens' dissent contains a listing of numerous such decisions. *See McNally,* 107 S.Ct. at 2883 footnotes 1–4.

3. 18 U.S.C. § 1341 provides in pertinent part:
   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ..., for the purpose of executing such scheme or artifice or attempting so to do, [uses the mails], shall be fined not more than $1,000 or imprisoned not more than five years, or both.

4. *See, e.g., Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942) and *Haas v. Henkel,* 216 U.S. 462, 480, 30 S.Ct. 249, 254, 54 L.Ed. 569 (1910).

derscore the proposition that a mail fraud prosecution is limited to allegations of fraud involving money or property. In *United States v. Herron*, 816 F.2d 1036, reconsidered and vacated in 825 F.2d 50 (5th Cir.1987) the court reconsidered *sua sponte* whether the facts alleged in the indictment constituted a cognizable violation of the wire fraud statute, 18 U.S.C. § 1343, and answering the question in the negative withdrew its previous opinion finding that the indictment did allege an offense in light of *McNally*.

After determining that the mail fraud and wire fraud statutes required an identical analysis in terms of "intangible rights," the *Herron* court held that a money laundering scheme designed to prevent the filing of Currency Transaction Reports (CTR)[5] failed to satisfy the "money or property" requirement of *McNally*.

In *United States v. Gimbel*, 830 F.2d 621, 41 Cr.L. 2403 (7th Cir.1987), the defendant's conviction for mail fraud based on a scheme of depriving the Treasury Department of Currency Transaction Reports and of other "accurate and truthful information and data" was vacated upon the finding that the indictment did not state an offense because it did not charge that the scheme deprived the Treasury Department of money or property.

*United States v. Fagan*, 821 F.2d 1002 (5th Cir.1987) announced just six days after the *McNally* decision, affirmed a conviction for mail fraud where the underlying scheme involved the payment of a kickback by the defendant to an employee of a company who was renting boats for use of off-shore drilling operations from the defendant. In footnote six of that opinion,

the court acknowledged the *McNally* decision and opined:

> We believe that there is sufficient evidence that the scheme here was one to deprive Texoma of its property rights, viz: its control over its money, as it parted with its rental payments on the basis of a false premise; the economic value of possibly being able to rent the boats from Fagan for less, had it known he was willing to accept less; its right to the kickbacks Riley received from Fagan.

*Fagan*, 821 F.2d at 1011 n. 6.

The predicate for a mail fraud violation is a "scheme or artifice" to defraud. *United States v. Rabinowitz*, 327 F.2d 62, 76–77 (6th Cir.1964). Thus, we next consider whether the scheme and artifice alleged in the indictment as the predicate for the eleven counts of mail fraud described conduct which is now prohibited by 18 U.S.C. § 1341 in the wake of the narrowing of the scope of that statute by *McNally*.

The lengthy indictment described the scheme and artifice as "to defraud the State of Tennessee of the right to issue certificates of registration to charitable organizations to conduct bingo games, based on complete, true and accurate information to be provided by those applying for said permits."[6]

The defendant argues, in light of *McNally*, that no testimony was offered nor was any claim advanced that Tennessee was deprived of any money or property by the alleged fraudulent conduct of the defendant. Rather, the defendant argues the scheme charged in the indictment describes an intangible right, i.e., Tennessee's right to accurate information with respect to its

---

5. A financial institution is required to file a CTR on "each deposit, withdrawal, exchange of currency ... or transaction in currency of more than $10,000." 31 C.F.R. § 103.22(a)(1); *see* 31 U.S.C. § 5313(a). The CTR filing is designed to provide the government with a "paper trail" in order to follow the unusual movement of large amounts of money. See *California Bankers Assn. v. Shultz*, 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974).

6. Count I through Count XI of the Indictment charged separate mail fraud violations. Count

XII charged obstruction of justice and Count XIII charged perjury. Counts II through XI reallege the allegations contained in paragraphs A and B of Count I. Sub-paragraphs 1–20 under paragraph B of Count I sets forth in substantial detail the means by which the scheme and artifice described in the first paragraph of paragraph B was carried out. Sub-paragraphs 1–7 under paragraph A and the first paragraph under paragraph B and paragraph C of Count I and Counts XII and XIII are set forth in the appendix to this opinion.

issuance of certificates of registration (i.e., bingo permits) to charitable organizations.

The government disagrees with the defendant's characterization of the indictment in this case. In support of its claim that the defendant's mail fraud convictions survive the *McNally* limitation to schemes involving money or property, the government advances the argument that the certificate of registration (i.e., the bingo license) is a property right. Building on that contention, the government cites *United States v. Schilling*, 561 F.2d 659, 662 (6th Cir.1977) and *United States v. Fischl*, 797 F.2d 306, 311–12 (6th Cir.1986) for the proposition that the "right to object" is an ancillary property right, inseparable from the existence of ownership. The government also asserts the opinion in *Fagan*, supports its analysis.

In *Schilling* and *Fischl* the right to object or the right to control, was not labeled as a property right, but rather as we read the cases, as examples of what *McNally* would describe as "intangible rights." In *Schilling*, the defendant, a member of the Shelby County Quarterly Court (a legislative body), had acquired an interest in property located within a flood control project. The property was subsequently offered for sale to the Chickasaw Basin Authority at a much higher proposed sale price and was conditioned upon the Quarterly Court approving and appropriating the purchase money. Thereafter, when the issue of the defendant's possible interest in the property surfaced, he falsely advised the Quarterly Court that he had divested himself of all interest in the property and would gain nothing from the approval of the sale. In fact, the defendant did not divest and realized a substantial profit from the Quarterly Court's approval. Count one of the indictment charging a mail fraud violation, as set out in the court's opinion, alleged in part:

> * * * devised and intended to devise a scheme and artifice to defraud (a) the consistency [sic] of defendant, BILLY RAY SCHILLING, whose interest he had been duly elected to represent * * * of their right to his conscientious, loyal, faithful and unbiased services * * * free from partiality, wilful omission * * * in-

consistent with the interests of his constituency * * * (b) the constituency of fellow-elected members of defendant, BILLY RAY SCHILLING * * * and the fellow-elected members of defendant, BILLY RAY SCHILLING, themselves by affirmatively misrepresenting a material fact to them so as to cause said fellow-elected members to exercise their judgment in a matter pending before them * * * thereby denying to the fellow-elected members their right to rely on the truth of material representation made by a fellow-elected member * * * and their right to faithfully perform their duties and responsibilities to their constituents unfettered by dishonesty on the part of a fellow member.

*Schilling*, 561 F.2d at pp. 661–62 (omissions in the original).

The dismissal of the first count was reversed on appeal with the holding that:

> Count one of the indictment alleges in effect that this scheme caused the members of the County Court to act favorably on the sale of the land and the appropriation of the money for its sale to the Chickasaw Basin Authority. The plain inference is that it caused the members of the Court to surrender their right to object to the sale which they obviously would have done as indicated by their previous action in cancelling the sale.

*Schilling*, 561 F.2d at 662.

It is readily apparent that the first count of the indictment was anchored in the intangible right of the defendant's constituency to his conscientious, loyal, faithful and unbiased services. Thus, the *Schilling* reference to the "right to object" is with reference to an intangible right, not to a property right as claimed by the government.

In *Fischl*, also a pre-*McNally* opinion regarding a mail fraud conviction, the defendant's elaborate kickback scheme was found to be in violation of the mail fraud statute. The *Fischl* court reasoned that the defendant, notwithstanding the fact that the defendant contemplated delivering marine vessels at the agreed contract price to the State of Michigan, intended to cheat

the Michigan legislature out of information which, if known, would have prevented an appropriation of the balance of money needed to complete the project. The evidence supported a determination that the defendant, by the kickback scheme, intended to cheat the Michigan transportation officials out of information to which they would have been entitled under the contract.

The *Fischl* court applied the reasoning of *Schilling* as it discussed the "right to object" stating:

the *Schilling* case did involve false representations, and as in the case at bar, the false representations were made to public officials. The defendants in *Schilling* contracted to sell property to a public authority that could not purchase it without the approval of a legislative body of which one of the defendants was a member. The defendants falsely represented that the member in question had divested himself of his interest in the property. This court, held it was error to dismiss the indictment: notwithstanding that the property might have been worth every penny that the public authority paid for it, there would be a criminal violation if, as alleged in the indictment, the members of the legislative body had been caused "to surrender their right to object to the sale." If the defendants defrauded the legislators of their "right to object," they committed "actual fraud" within the meaning of *Epstein* [*Epstein v. United States*, 174 F.2d 754].

Applying the logic of *Schilling* to the case at bar, it is clear that at the very least Mr. Fischl defrauded the State of its right to terminate the UPSCO contract. Untruthful "lulling letters" of the

sort for which Mr. Fischl was responsible, and which in this case induced the State to continue funding the UPSCO project, have repeatedly been held sufficient to support mail fraud conviction. *United States v. Ashdown*, 509 F.2d 793, 800 (5th Cir.), *cert. denied*, 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975); *United States v. MacClain*, 501 F.2d 1006, 1012 (10th Cir.1974).

*Fischl*, 797 F.2d at 312.

The "right to terminate" addressed in *Fischl* is closely analogous to the "right to object" in *Schilling*, and we are convinced that *Fischl* similarly fails to support the government's argument.

■ Mindful of the implied suggestion in *McNally*, (see, *McNally*, —— U.S. at ——-——, 107 S.Ct. at 2875–76), that the concept of property rights are to be given a liberal interpretation,[7] we find that the issue with respect to the question of whether the scheme and artifice as described charges a mail fraud violation under the *McNally* limitations, distills to a consideration of whether Tennessee's "right to control or object" with respect to the issuance of a bingo permit to a charitable organization constitutes "property." The eighth footnote in *McNally* is instructive, as it concludes with the declaration, "the mail fraud statute, as we have indicated, had its origin in the desire to protect individual property rights, and any benefit which the government derives from the statute must be limited to the Government's interests as property-holder." *McNally*, —— U.S. at ——, n. 8, 107 S.Ct. at 2881 n. 8. In our view, the certificate of registration or the bingo license may well be "property" once issued, insofar as the charitable organiza-

---

**7.** As an example of a liberal interpretation, see the recent decision of the Supreme Court in *Carpenter v. United States*, —— U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). Winans, a co-defendant in the *Carpenter* case, wrote a column for the Wall Street Journal entitled "Heard on the Street." The column discussed selective stocks or groups of stocks, giving positive and negative information about those stocks and taking a point of view with respect to investment in the stocks. Contrary to the policy of the Wall Street Journal, Winans repeatedly gave the co-defendants advance information about the substance of up-coming columns and the co-defendants used that information to invest in the stocks mentioned in the column with a resulting profit of $690,000 in which Winans shared. The Court held that the Wall Street Journal's business information that it intended to be kept confidential until the publication of the column constituted a property right in the context of prosecutions for violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.

tion is concerned, but certainly an unissued certificate of registration is not property of the State of Tennessee and once issued, it is not the property of the State of Tennessee. In sum, we find that Tennessee's right to accurate information with respect to its issuance of bingo permits constitutes an intangible right and thus the scheme and artifice as charged in the indictment in support of the eleven counts of mail fraud does not state a crime 18 U.S.C. § 1341 as narrowed by *McNally.* So finding, the convictions for the eleven counts of mail fraud must be dismissed.[8]

## II. EVEN ASSUMING THE INDICTMENT FOR MAIL FRAUD SURVIVES McNALLY INSPECTION, THE CONVICTIONS CANNOT BE SUSTAINED IN LIGHT OF THE COURT'S CHARGE TO THE JURY.

The second issue arising from the mail fraud convictions also emerged in the post-argument briefs and relates to the district court's charge to the jury. The scheme and artifice to defraud was described with respect to mail-fraud counts in the indictment in the district court's charge to the jury in relevant part as follows:

> The words scheme and artifice as used in this statute include any plan or course of action intended to deceive others and obtain by fraud or fraudulent pretenses, representations privileges granted by the State of Tennessee, including bingo permits, or money, from the person so deceived.

Tr. p. 1446—lines 20–25.

> Two essential elements are required to be proved in order to establish the offenses charged in the first eleven counts of the indictment.
>
> First, that the defendant wilfully and knowingly devised a scheme or artifice to defraud, *or to obtain money* or the privilege of operating a bingo game by means

of false pretenses, representations or promises.

Tr. p. 1447—lines 12–18 (emphasis added).

■ In sum, the district court advised the jury that the defendant was guilty of the mail fraud counts if the jury found that the scheme or artifice was *"to obtain money . . .* by means of false pretenses, representations or promises." *Id.* (emphasis added). However, that particular scheme or artifice was not charged in the indictment. The predicate for a mail fraud violation is a "scheme or artifice" to defraud a person or entity of its money or property. The government argues that the jury could have found such an artifice or scheme to obtain money proven by the evidence and thus, the defendant's convictions should be affirmed.

It is the purpose of the indictment to frame the charge which the defendant is obliged to meet. *Russell v. United States,* 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). It is well established that when the Court, by its jury charge, changes the crime from that for which the defendant was indicted, a subsequent guilty verdict must be vacated. *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed. 2d 252 (1960); *Cf. United States v. Miller,* 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985); *United States v. Runnels,* 833 F.2d 1183 (6th Cir.1987). Consequently, if we are incorrect in holding that the mail fraud indictments fail to state a crime by reason of the *McNally* holding, nonetheless, the district court's jury charge broadening the scope of the indictment by requiring the defendant to defend against an uncharged scheme or artifice to obtain money by false pretenses, representations or promises would necessarily require that the mail fraud convictions be vacated and remanded for further proceedings.

However, holding to the view that the mail fraud counts fail to charge a crime under *McNally,* the defendant's convictions of the eleven counts of mail fraud are dismissed.[9]

---

8. The defendant-appellant has claimed that the evidence of mailing or causing to be mailed was insufficient as to a number of the mail fraud counts. We see no need to consider that issue

based upon our holding that the indictment failed to allege a § 1341 violation.

9. The government's supplemental brief filed on October 26, 1987 relies heavily on *United States*

## III. THE CONVICTIONS FOR OBSTRUCTION OF JUSTICE AND PERJURY.

In light of *McNally* and in anticipation of a ruling holding that the indictment failed to state a post-*McNally* mail fraud violation, the defendant argues that his convictions for obstruction of justice and perjury are tainted by the "spillover" effect of the testimony advanced in support of the mail fraud violations and should be set aside. We disagree.

Federal Rules of Criminal Procedure 8(a) provides for joinder of offenses "if the offenses charged, ... are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Relief from prejudicial joinder of defendants or offenses is required by Federal Rules of Criminal Procedure 14. Initially we note that the defendant did not claim misjoinder under Fed.R.Crim.P. 8 or request Fed.R.Crim.P. 14 relief from the joinder of the mail fraud counts with the additional counts of obstruction of justice and perjury.

The indictment did charge mail fraud violations that would have passed muster prior to *McNally*. Overwhelming proof was presented of the defendant's commitment to the scheme and artifice charged in the indictment. The government proceeded lawfully in its investigation of the defendant's conduct. The jury was presented with evidence which clearly supported the convictions for obstruction and perjury, both extremely serious crimes, particularly for one who has sought and obtained the right to sit in judgment of the conduct of others in his role with the judiciary. Had the defendant sought and obtained a severance of the obstruction and perjury charges from the mail fraud charges, the evidence of defendant's conduct which formed the basis of the mail fraud prosecutions would have been admissible under the provisions of Evidence Rule 404(b) to set in proper perspective the defendant's conduct as it related to the obstruction and perjury charges. *United States v. Lane*, 474 U.S. 438, 450, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986).

In the main, "spillover" defenses are raised in the aftermath of a denied defense motion for a severance. With the advent of criminal prosecutions for RICO violations (18 U.S.C. § 1962(c)), courts have examined the issue of whether the effect of a RICO violation subsequently dismissed before the jury began deliberating on other charges has a "spillover" effect tainting the remaining convictions, in light of the "racketeer" label attached to the dismissed RICO count. *United States v. Stefan*, 784 F.2d 1093, 1101 (11th Cir.1986); *United States v. Kabbaby*, 672 F.2d 857, 861–62 (11th Cir.1982); *United States v. Guiliano*, 644 F.2d 85, 89 (2nd Cir.1981).

In seeking a ruling setting aside the obstruction and perjury convictions, the defendant urges the Court to adopt and apply in this case the two-step test adopted by the Eleventh Circuit in *United States v. Stefan*, 784 F.2d 1093 (11th Cir.1986) to determine whether the "spillover" effect of the "racketeer" label requires reversal. The *Stefan* test consists of two questions:

1. Did the jury meticulously sift the evidence?
2. Was the defendant prejudiced by a spillover of evidence relating to the other counts?

*Stefan*, 784 F.2d at 1101.

We decline to adopt the *Stefan* test. We find the "meticulously sifting" test difficult

*v. Wellman*, 830 F.2d 1453 (7th Cir.1987), for support of its proposition that notwithstanding the variance between what is charged in the indictment and what was charged to the jury, sufficient evidence was presented for a finding of a violation of the mail fraud statute. The *Wellman* decision is distinguishable from the case at bar in that the indictment here, as indicated earlier, charges a violation of only an intangible right whereas in *Wellman* the indictment, taken as a whole by the circuit court, alleged a violation of a property right. The indictment here, in its broadest sense, cannot be said to allege a violation of a property right. Furthermore, we decline to look through the indictment to the substantive allegations and determine that the indictment alleges a crime under *McNally* given the strong policy of not requiring an accused to defend an additional charge not set out in the indictment. *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed. 2d 252 (1960).

to apply. The defendant asserts that the fact that the jury deliberated in this case for less than an entire day negates a finding that the jury engaged in a "meticulous sifting" of the evidence. In our view, the "meticulous sifting" test is one designed for rank speculation as to what occurred in the privacy of the jury room during deliberations.

■ We continue to adhere to the principles of *United States v. Swift*, 809 F.2d 320 (6th Cir.1987) which addressed the effect of "spillover" in the context of the defendant's failure to request a severance and where the court declared that to cause error by a "spillover" effect with respect to a trial of several defendants, the defendant moving for a severance "must demonstrate an inability of the jury to separate and treat distinctively, evidence relevant to each particular defendant." *Swift*, 809 F.2d at 322. The same analysis applies where the defendant claims a "spillover" effect with respect to counts for which a dismissal is ordered as the proof of the dismissed counts might prejudicially "spillover" on to the remaining convictions. While related with respect to motive, the mail fraud charges constituted conceptually a totally separate type of crime from that of obstructing justice and perjury. In sum, we find no prejudicial "spillover" effect requiring a vacation of the convictions for obstructing justice and perjury and those convictions are affirmed.

## IV. CONSIDERATION OF ERRORS CLAIMED BY THE DEFENDANT IN THE FIRST BRIEF FILED PRIOR TO McNALLY.

### A.

■ The defendant's motion to dismiss the indictment based upon his assertion that he had been singled out for selective prosecution is without merit. The defendant bears the burden of demonstrating that the trial court's denial of the motion was clearly erroneous. *United States v. Bohrer*, 807 F.2d 159, 161 (10th Cir.1986). The test for a selective prosecution defense, as established by *United States v. Hazel*, 696 F.2d 473, 474–75 (6th Cir.1983) requires as the first step that the defendant was singled out for prosecution while others similarly situated were not charged. The investigation which led to the defendant's demise initially focused on the conduct of Ronald Smith. He, like the defendant, was indicted, convicted and sentenced to prison. The defendant was, therefore, not singled out for prosecution.

### B.

The defendant's initial brief challenged the sufficiency of the evidence. As we have vacated and held void the convictions for mail fraud, an examination of the sufficiency of the evidence with respect to whether certain documents were received by way of the mails is unnecessary. The defendant's attacks upon the sufficiency of the evidence on the obstruction of justice and perjury charges are without any merit.

### C.

No consideration of the third error is necessary as it relates to challenged evidentiary rulings relating to the mail fraud convictions.

### D.

■ Following his conviction, the defendant sought permission from the trial court to question juror Stover to determine if Stover's plans to leave on a vacation had affected his deliberations. The request was correctly denied on the authority of Rule 606(b) of the Federal Rules of Evidence which limits inquiry of jurors into the validity of a verdict and expressly prohibits such an inquiry as to "effect of anything upon his or any other juror's mind or emotions as influencing him to assent or to dissent from the verdict."

## CONCLUSION

The convictions and sentence of the defendant for obstruction of justice and per-

jury are affirmed. The convictions and sentences of the defendant for the eleven counts of mail fraud are vacated and this case is remanded for an entry of dismissal of the eleven counts of mail fraud.

## APPENDIX

## INDICTMENT

THE GRAND JURY CHARGES:

### COUNT 1

A. That at all times material to this indictment

1. The defendant IRA HENDERSON MURPHY was an attorney in Memphis, Tennessee. Commencing in September 1982, the defendant Murphy became an elected General Sessions Court Judge for Shelby County, Tennessee [sic]

2. Under Tennessee law charitable organizations soliciting funds had to register with the Secretary of State of Tennessee. Charitable organizations exempt from taxation pursuant to Section 501(c)(3) of the Internal Revenue Code of 1954, as amended, could conduct bingo games providing certain conditions were met. No part of the gross receipts derived from bingo games could inure to the benefit of any member or employee of the organization. The conduct of the bingo games was to be strictly according to certain requirements, including, but not limited to:

The organization had to be exempt from tax under Section 501(c)(3) of the Internal Revenue Code of 1954, as amended; persons conducting the games on behalf of organizations had to be members in good standing of the organization for not less than one year; the organization had to have been in existence for at least 5 years; and bingo games could be conducted only at the place of the organization's domicile. Prior to conducting bingo games, the Secretary of State had to give permission following a registration process which was to ensure compliance with the law.

3. An initial application for a registration statement had to be made with the State by a charitable organization seeking to conduct bingo games in accordance with Tennessee law. An application had to be completed, which contained certain information, including, but not limited to: the name of the organization; its principal address; location of bingo game; whether funds in excess of $5,000 or $10,000 would be received during the registration period; whether or not the organization had received a tax exemption from the Internal Revenue Service; for what purpose contributions would be used; names and addresses of persons having responsibility for the custody and distribution of contributions; the names and addresses of the bank into which funds received would be deposited and the persons authorized to write checks on that account; and the names and addresses of the persons conducting the games (indicating the length of time the member has been in good standing of the organization). This application form had to be certified by the president and/or executive director of the organization that the information was complete, true and correct. The person authorized to disburse funds pursuant to Tennessee law was also required to sign this application.

4. Once an organization had been given permission to conduct bingo games, it was required that they file an annual accounting form, along with their application form. The accounting form had to list information about the bingo operation, including, but not limited to: Total amount of receipts, cost of prizes, gross receipts (receipts less cost of prizes), necessary and reasonable costs/expenses, proceeds, and the names of recipients of proceeds. This annual accounting form had to be signed and notarized by the person authorized to make disbursements of the proceeds.

5. The Most Worshipful Prince Hall Grand Lodge of Free and Accepted Masons of Tennessee had its state headquarters in Memphis, Tennessee. On September 10, 1956, a Lodge designated as H.D. Whalum

Lodge F & A.M. No. 373 was opened in Memphis, Tennessee. The H.D. Whalum Lodge No. 373 was closed in November 1963. It was reactivated in April 1979, remaining in operation until August 1981. It has remained closed since that time.

6. Ronald J. Smith operated a bingo game at 4128 South Plaza Drive, Memphis, Tennessee. Smith had conducted a bingo game at this location on a substantially continuous basis since on or about 1972. Smith operated the bingo games under the sponsorship of three different organizations during the period of this indictment, that is, the A. Phillip Randolph Institute, the Citywide Community Council, and the H.D. Whalum Lodge #373.

7. Dean White III was an attorney in Memphis, Tennessee who at different periods of this indictment represented Ronald J. Smith and the other sponsoring organizations.

B. From on or about November 16, 1982, until on or about May 15, 1985, the exact date to the grand jury unknown, in the Western District of Tennessee, the defendant,

—IRA HENDERSON MURPHY—

being aided, abetted and counseled by persons known and unknown to the grand jury, knowingly, wilfully and unlawfully devised and intended to devise a scheme and artifice to defraud the State of Tennessee of the right to issue certificates of registration to charitable organizations to conduct bingo games, based on complete, true and accurate information to be provided by those applying for said permits.

The scheme and artifice to defraud by means of false and fraudulent pretenses and representations, so devised and intended to be devised by the defendant and others, was in substance as follows:

\*     \*     \*     \*     \*     \*

C. On or about November 15, 1982, in the Western District of Tennessee, the defendant,

—IRA HENDERSON MURPHY—

for the purpose of executing the aforesaid scheme and artifice to defraud and attempting to so do, did knowingly cause to be placed in an authorized depository for mail matter, to be sent and delivered by the United States Postal Service according to the directions thereon, an envelope, said envelope containing, among other things, a letter from the defendant Murphy to the Director, Charitable Solicitations, Office of the Secretary of State, Nashville, Tennessee, and supporting documentation, including an application for a registration statement to operate a bingo game; in violation of Title 18 United States Code, Sections 1341 and 2.

## COUNT XII

From on or about June 7, 1985, to on or about June 12, 1985, in the Western District of Tennessee, the defendant,

—IRA HENDERSON MURPHY—

did knowingly, intentionally and unlawfully influence, obstruct, and impede and endeavor to influence, obstruct, and impede the due administration of justice by attempting to influence the testimony of Charles Brooks before a federal grand jury then impanelled and sitting in the Western District of Tennessee, said grand jury conducting an investigation into bingo operations of Ronald J. Smith; the role of the H.D. Whalum Lodge No. 373 and the sponsorship of said bingo operation; and the roles of those persons listed on the H.D. Whalum Lodge No. 373 bingo applications, including Charles Brooks and Ira Henderson Murphy; in violation of Title 18 United States Code Section 1503.

## COUNT XIII

1. On or about June 18, 1985, in the Western District of Tennessee, at Memphis, IRA HENDERSON MURPHY, while under oath as a witness in an investigation then being conducted by the grand jury for the Western District of Tennessee, know-

ingly did make materially false declarations, that is to say:

2. At the time and place aforesaid, the grand jury was engaged in an investigation which involved certain bingo operations being conducted in the City of Memphis, and whether or not certain federal criminal statutes, including, but not limited to, the illegal gambling business statute, the Mail Fraud statute, the Wire Fraud statute, and violations of the Internal Revenue Code had taken place.

3. It was a matter material to this investigation to determine whether IRA HENDERSON MURPHY had participated in any illegal gambling operations involving bingo, whether he had participated in certain fraudulent activities in obtaining or renewing permits from the State of Tennessee to operate bingo games, and whether IRA HENDERSON MURPHY had participated in violations of the Internal Revenue Code. It was a matter further material to the investigation to determine exactly Murphy's role in having the H.D. Whalum Lodge No. 373 sponsor and operate bingo games at 4128 South Plaza Drive, and whether or not Murphy had forged or caused to be forged certain signatures on documents submitted to the State of Tennessee or on documents utilized at the bingo operation at 4128 South Plaza Drive.

4. At the time and place aforesaid, IRA HENDERSON MURPHY while under oath, did knowingly declare in part before the grand jury in regard to this material matter as follows:

Q. Was Mr. Smith a member of the H.D. Whalum Lodge?

A. Who is that; Ronnie Smith?

Q. Yeah.

A. No, sir.

Q. Was he supposed to be a member in order to run the bingo?

A. I would have to—the statute speaks for itself on that, Mr. Ewing.

Q. I think you know what the statute provides.

A. I wouldn't be so sure about that.

Q. Did you have anything to do with making out membership cards for anybody?

A. The membership applications, other than securing them, but that was about all. No, I didn't have anything specifically to do with the cards per se.

Q. Well, let me show you one of these little yellow cards that says the H.D. Whalum Lodge Auxiliary Committee, have you ever seen one of those?

(Thereupon, the above-described [sic] card was passed to the witness.)

A. No, sir.

Q. You have never seen one of those cards?

A. I don't have any recollection of ever seeing one. It shocks me when I see that.

Q. Do you know Charles Brooks?

A. Yes, sir.

Q. Do you know whether he signed those cards?

A. I wouldn't know.

Q. Mr. Murphy, do you have any knowledge where any signatures on any documents submitted to the State are forgeries?

A. Not to my knowledge. I am standing behind my privilege, but not to my knowledge have I known of any signatures that were forgeries.

Q. You say that you are standing behind your privilege.

A. Yes, sir. I don't know of any forged signatures being submitted to the State.

5. The aforesaid declaration by IRA HENDERSON MURPHY as set forth in paragraph 4 of this count contained materially false declarations, which were known by the defendant to be false when made in that IRA HENDERSON MURPHY had had something to do with yellow cards bearing the name H.D. Whalum Lodge # 373 Community Service Auxiliary Committee, in that he had signed the name "Charles Brooks" on the membership cards of persons working at the bingo operation at 4128 South Plaza Drive; and in that he knew that Charles Brooks had not signed the cards, because he had signed them him-

self; and in that he knew that a document bearing a forged signatures [sic] of "Charles Brooks" had been submitted to the State of Tennessee; in violation of Title 18, United States Code, Section 1623.