Zachariah JOHNSON, a minor, and Vera Johnson,
Plaintiffs-Appellants,†

Valrick Johnson, Plaintiff,

v.

Jose AGONCILLO, M.D., Wisconsin Health Care
Liability Insurance Plan, Wisconsin Patients Compen-
sation Fund and Curative Rehabilitation Center,
Defendants-Respondents.

Court of Appeals

*No. 93–0839. Oral argument February 16, 1994.—Decided
March 15, 1994.*

(Also reported in 515 N.W.2d 508.)

†Petition to review denied.

143

144

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Sean N. Duffey* and *Richard H. Schulz* of *Schulz & Duffey, S.C.*, of Milwaukee. There was oral argument by *Sean N. Duffey*.

On behalf of the defendants-respondents, the cause was submitted on the briefs of *Michael J. Pfau* and *Joseph M. Fasi, II*, of *Hinshaw & Culbertson* of Milwaukee. There was oral argument by *Joseph M. Fasi, II*.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

FINE, J. Vera Johnson and her minor son appeal from a judgment entered on a jury verdict finding that her physician, Jose Agoncillo, was not negligent in his

care and treatment of her pregnancy. She raises three issues. First, she contends that the trial court failed to instruct the jury on the standard of care that she argues should have been applied to Dr. Agoncillo in this case. Second, she claims that the trial court improperly excluded expert testimony relating to that standard of care. Third, she submits that the trial court should have granted her motion for a new trial because of what she claims was the failure by several of the jurors to reveal their biases during the *voir dire*, and because the jury allegedly considered extraneous and prejudicial material. We affirm.

## I.

Dr. Agoncillo is a family practitioner with a general medical practice. He was Johnson's physician during her pregnancy with Zachariah. Zachariah was born in November of 1986, after a gestation of only twenty-three weeks. He weighed a little more than a pound at birth. He suffers and will continue to suffer from catastrophic complications of his prematurity.[1]

Ms. Johnson suffered two miscarriages that antedated her pregnancy with Zachariah. Her first miscarriage was in February of 1985. She had a second miscarriage in November of 1985. The parties agreed at trial that Ms. Johnson was a high-risk obstetrical patient. The Johnsons contend that Dr. Agoncillo was negligent because he did not fulfill the standard of care applicable to physicians who specialize in treating high-risk obstetrical patients, and claim that the trial court erred by not instructing the jury that Dr. Agoncillo should be held to the standard of care applicable to those specialists. As noted, they also claim that

---

[1] The jury assessed total damages at $3,566,000.

the trial court improperly excluded expert testimony on the standard-of-care issue, and that there was prejudicial juror-misconduct. We analyze these issues in turn.

## II.

A. *The jury instruction.*

"The trial court has broad discretion when instructing a jury," and "an allegedly erroneous jury instruction," requires a new trial only if "the overall meaning communicated by the instructions" did not correctly state the law. *Fischer v. Ganju*, 168 Wis. 2d 834, 849-850, 485 N.W.2d 10, 16 (1992). We recently restated the standard of care applicable in medical malpractice actions:

> Wisconsin law holds that a physician (general practitioner or specialist) is liable in an action for medical negligence if he or she fails to exercise that degree of care and skill which is exercised by the average practitioner in the class to which he or she belongs, acting in the same or similar circumstances. *Shier v. Freedman*, 58 Wis. 2d 269, 283-84, 206 N.W.2d 166, 174 (1973).

*Zintek v. Perchik*, 163 Wis. 2d 439, 461, 471 N.W.2d 522, 530 (Ct. App. 1991). Thus, the applicable pattern jury instruction, WIS J I—CIVIL 1023, reads:

> In treating (plaintiff), (doctor) was required to use the degree of care, skill, and judgment which is usually exercised in the same or similar circumstances by the average (physician who is a general practitioner) (specialist who practices the specialty which (doctor) practices), having due regard for the

148

state of medical science at the time (plaintiff) was treated. The burden in this case is on (plaintiff) to prove that (doctor) failed to conform to this standard.

The standard-of-care instruction given to the jury by the trial court here tracked both *Zintek*'s restatement and WIS J I—CIVIL 1023:

> Now, in treating Vera and Zachariah Johnson, Dr. Agoncillo and Family Health Plan were required to use the degree of care, skill, and judgment which is usually exercised in the same or similar circumstances by the average family practitioner who treats obstetrical patients having due regard for the state of medical science at the time Vera and Zachariah were treated.
>
> The burden on this case is on Vera and Zachariah Johnson to prove that Dr. Agoncillo and/or Family Health Plan failed to conform to this standard.

The Johnsons requested, however, that the trial court give the following instruction, which, they argue, was mandated by *Zintek*:

> In treating Vera and Zachariah Johnson, Dr. Agoncillo and Family Health Plan were required to use the degree of care, skill, and judgment which is usually exercised in the same or similar circumstances by the average physician who treats high risk obstetrical patients, having due regard for the state of medical science at the time Vera and Zachariah were treated.
>
> The burden on this case is on Vera and Zachariah Johnson to prove that Dr. Agoncillo and/or Family Health Plan failed to conform to this standard.

The Johnsons argue that because Dr. Agoncillo, a family practitioner, undertook to treat a high-risk obstetrical patient, he should be held to the standard of "the average physician who treats high risk obstetrical patients, rather than the average family practitioner who treats such patients."[2] We disagree.

The plaintiffs in *Zintek* alleged that a hospital emergency-room physician and an internist specializing in infectious diseases negligently treated Susan Zintek's heart attack preceding and following her admission to the hospital. *Id.*, 163 Wis. 2d at 448-452, 459, 471 N.W.2d at 525-526, 529. The plaintiffs sought an instruction that defined the applicable standard of care as that " 'exercised *by the average specialist, in emergency medicine or cardiology.*' " *Id.*, 163 Wis. 2d at 459, 471 N.W.2d at 529 (emphasis added by *Zintek*). The defendants, on the other hand, requested that the trial court define the applicable standard of care as that " 'usually exercised in the same or similar circumstances by the *average physician who practices their* [sic] *respective discipline* [sic] at the time Susan Zintek was treated.' " *Id.*, 163 Wis. 2d at 459, 471 N.W.2d at 530 (emphasis added by *Zintek*, first "[sic]" in original).

*Zintek* characterized the parties' respective concerns over the standard-of-care instruction and the trial court's resolution as follows:

> [The] instruction dispute . . . was drawn on two fronts: (1) whether the instructions should characterize the [physicians] as "average specialists" or "average physicians"; and (2) whether the instructions should allude to "cardiology" since neither [the

[2] The Johnsons admitted in a hearing before the trial court that "[t]here are not a lot of high-risk obstetricians in the United States."

emergency room physician] nor [the internist] is a cardiologist.

 The trial court partially accommodated the [defendants'] concerns. The court modified the standard instruction to read "the degree of care, skill and judgment which is usually exercised in the same or similar circumstances by the *average physician* who renders emergency care and *treats cardiac patients*."

*Id.*, 163 Wis. 2d at 459-460, 471 N.W.2d at 530 (emphasis added by *Zintek*). Inadvertently, however, the trial court also used the phrase "average specialist" in an otherwise unidentified "second paragraph" of the instruction. *Id.*, 163 Wis. 2d at 460, 471 N.W.2d at 530. The jury returned a substantial verdict for the Zinteks, 163 Wis. 2d at 447-448, 471 N.W.2d at 524-525, and the defendants argued on appeal that the instructions' reference in that second paragraph to " 'average specialist' in conjunction with 'treatment of cardiac patients' " required a new trial, *see id.*, 163 Wis. 2d at 461, 471 N.W.2d at 530. Although conceding that use of the word "specialist" was "arguably erroneous," we affirmed, holding, *inter alia*, that "taken in context," the instructions' isolated use of the word did not prejudice the defendants. *Ibid.*

 Contrary to the Johnsons' argument, *Zintek* did not require that physicians of one class who treat patients whose medical problems arguably require the expertise of physicians in another class conform to the standard of care applicable to that other class. Thus, for example, a cardiologist who attempts to treat a patient with cancer is, in the words of WIS J I—CIVIL 1023, "required to use the degree of care, skill, and judgment which is usually exercised in the same or

151

similar circumstances by the average" cardiologist [the "specialist who practices the specialty which (doctor) practices"]; the cardiologist is not held to the standard applicable to oncologists. The cardiologist who negligently attempts treatment outside of his or her expertise is not, however, thereby immunized from liability. If competent evidence establishes that the average cardiologist would either refer the cancer patient to an oncologist or would consult with an oncologist, the cardiologist could be found negligent for not referring or consulting. Under the current state of Wisconsin law, however, the cardiologist is not held to an oncologist's standard of care. Thus, that Dr. Agoncillo chose to care for and treat Ms. Johnson during her high-risk pregnancy did not transform his "class" of physician to that of those who treat high-risk obstetrical patients; he was and he remained a general family practitioner who treated obstetrical patients and, as instructed by the trial court, he was thus "required to use the degree of care, skill, and judgment which is usually exercised in the same or similar circumstances" by the average physician in that class. Although the instruction proposed by the Johnsons tracked the compromise instruction fashioned by the trial court in *Zintek*, the trial court's instruction here correctly stated the law.[3] There was no error.

---

[3] During the instruction conference, the trial court advised counsel that the Johnsons could argue to the jury that under the circumstances an average family physician who treats obstetrical patients should have either referred Ms. Johnson to a specialist, "or be held to the different standard." During their summation to the jury, the Johnsons made precisely this argument:

> The instructions which you heard talk about the standard of care of the average family practitioner under the circumstances.

## B. *The excluded testimony.*

Prior to trial, the defendants moved *in limine* to prohibit the Johnsons from eliciting opinions from any of the expert medical witnesses as to what they might have done in treating Ms. Johnson, arguing that the applicable standard referenced the average physician of Dr. Agoncillo's specialty and not what individual physicians might have done under the circumstances. Specifically, the defendants objected to a deposition question the Johnsons asked one of the defense expert witnesses as to how he would have treated Ms. Johnson if she were his wife. The trial court ruled that absent a foundation that made the witness' practice material to the standard of the average physician, a "direct question" as to how the witness would have treated Ms. Johnson would not be permitted. The trial court explained:

> THE COURT: It's one thing when you say, doctor, what do you base your opinion on, what's average on the basis of what you have seen among practitioners in your specialty? Yes. The— Do you have an idea of what the average doctor that, based upon that experience, would have done? Yes. What is it? I don't see anything wrong with that.
> [Defendants' counsel]: That's all right.
> THE COURT: But when you say, doctor, you, just awed this jury with your incredible credentials and expertise, what do you — you have done in 1986, that— that's not appropriate because it is not — he's not admitted that he's the average.

---

Under the circumstances of this case, the doctor must render reasonable care. And that may mean if he's going to treat her, that he treat her like a high risk obstetrical patient or refer her out.

Thus, the trial court noted as an example, that it would be permissible for the Johnsons to ask whether the course of treatment that the expert witness would have taken if Ms. Johnson were his patient affected his view as to what the average physician would have done under the circumstances.

A trial court's decision to admit or exclude evidence is a discretionary determination and will not be upset on appeal if it has "a reasonable basis" and was made " 'in accordance with accepted legal standards and in accordance with the facts of record.' " *State v. Pharr*, 115 Wis. 2d 334, 342, 340 N.W.2d 498, 501 (1983) (citation omitted). The trial court's ruling on the motion *in limine* was well within the ambit of its discretion. As we have seen in part II. A., the trial court applied the appropriate standard of care. Further, it recognized that how the expert witness would have treated Ms. Johnson would be relevant under some circumstances. Additionally, it was sensitive to the possibility that the witnesses' high level of expertise could overwhelm the jury's assessment of what a general family practitioner like Dr. Agoncillo should have done. *See* RULE 904.03, STATS. ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of . . . confusion of the issues, or misleading the jury . . . ."). We now turn to the trial court's rulings on this issue in the context of the Johnsons' specific claims of error.

1. Charles A. Larson, M.D.

Dr. Larson, a board-certified family practitioner in Guntersville, Alabama, was called by the Johnsons. He testified that among other things, he has "done obstetrical work." In their brief before this court, the

Johnsons claim that Dr. Larson was prevented from testifying "as to what treatment would have been rendered by the average physician who treats high-risk obstetrical patients under the same or similar circumstances, [because] the trial court ruled that this was not relevant under [its] view of the standard of care." At the record reference given, Dr. Larson is asked by the Johnsons about the "goals and obligations of the family practitioner or the average family practitioner during the first prenatal visit." Dr. Larson responded: "Of the prenatal visits that a family practitioner, obstetrician has, I think the first one is probably the most important." Defense counsel objected that the question asked only about a family practitioner. The trial court sustained the objection—presumably on the ground that the answer was not responsive.[4] Nevertheless, the question was re-read to Dr. Larson by the court reporter, and Dr. Larson explained to the jury without objection that for the "average family practitioner who does obstetrics, the most critical visit, I think, is probably the most — the first prenatal visit." The Johnsons' claim of error is without merit.

[4]Although not pointed out to the trial court by Johnsons' counsel, or raised on appeal, the objection that an answer is not responsive can be made only by the questioner. *See* 1 McCORMICK ON EVIDENCE § 52 at 201 n.6 (J. Strong 4th ed. 1992). The reason is clear: any admissible statement by the witness, albeit "nonresponsive," could be elicited by the very next question. Accordingly, the opponent's objection to the statement should raise the substantive evidentiary infirmity, if there is one. *See* RULE 901.03(1)(a), STATS.; *State v. Romero*, 147 Wis. 2d 264, 274, 432 N.W.2d 899, 903 (1988).

### 2. James H. Harger, M.D.

Dr. Harger, also called by the Johnsons, is a maternal fetal specialist at the University of Pittsburgh Medical Center. He described the specialty as that of "an obstetrician who has two extra years of training in dealing with pregnancies, complications and high-risk pregnancies, and who then takes another set of board examinations to be specialized with what is called competence in maternal fetal medicine or high-risk obstetrics." The trial court sustained the defendants' objection to the following question asked by the Johnsons:

> Doctor, what is your opinion to a reasonable degree of medical probability as to what should have been done by the average doctor handling a high-risk pregnancy before the next pregnancy or anticipation of a pregnancy?

The trial court, however, permitted the Johnsons to ask:

> Doctor, do you have an opinion to a reasonable degree of medical certainty as to what the average family practitioner should do in anticipation of another pregnancy after the two pregnancies [that resulted in miscarriages] that you just described?

The latter question conformed to the standard of care applicable to Dr. Agoncillo. Although the first question could be read as merely asking what someone in Dr. Agoncillo's class would have done when faced with Ms. Johnson's pregnancy, it could also be read as attempting to apply a standard of care applicable to those physicians who routinely treated high-risk pregnancies. Given the Johnsons' repeated attempts to

156

have the trial court apply a specialist's standard of care to Dr. Agoncillo, the trial court acted within the scope of its discretion when it sustained the objection to the first question and permitted the Johnsons to ask the second question. Johnsons' claim of error is without merit.

### 3. Frank Boehm, M.D.

Dr. Boehm, a board-certified obstetrician and an assistant professor of obstetrics and gynecology at Vanderbilt University, was called by the defendants. During argument out of the jury's presence on an unrelated evidentiary issue, the trial court reaffirmed that it would not permit the Johnsons to ask Dr. Boehm what his "individual standard of care is." For the reasons explained in our discussion of the trial court's ruling on the defendants' motion *in limine* on this issue, the Johnsons' claim of error in connection with Dr. Boehm is without merit.[5]

### 4. Alleged preclusion of impeaching cross-examination.

[5] The Johnsons also argue that the trial court improperly excluded deposition testimony as to how one of the defense medical experts would have treated Ms. Johnson if she were his wife, and the deposition testimony by Dr. Boehm as to how he would have treated Ms. Johnson as well as his opinion that some of his partners would have performed a particular procedure on Ms. Johnson. The Johnsons, however, do not give us a record reference to the trial court's rulings, nor have they included the trial court's rulings in their appendix, as required by RULE 809.19(2), STATS. In light of our conclusion that the trial court did not erroneously exercise its discretion in ruling on the defendants' motion *in limine*, however, we perceive no error as to the deposition testimony.

In their main brief before this court, the Johnsons claim that they were prevented from asking on cross-examination about "information known to [the defendants' expert medical] witnesses which was inconsistent with the opinions they had expressed, in an attempt to impeach their 'double standard of care.' " At oral argument, the Johnsons explained that by "double standard of care" they meant that the defense experts would treat Ms. Johnson one way if she were a wife or patient but that the standard of care applicable to Dr. Agoncillo's specialty was different. In its ruling, the trial court reiterated its decision on the defendants' motion *in limine* on this issue. For the reasons we have already explained, the Johnsons' claim of error is without merit.

C. *Alleged juror misconduct.*

The Johnsons assert that they are entitled to a new trial because of what they contend was the unrevealed bias of some of the jurors, and the jury's alleged consideration of prejudicial extraneous material. We discuss these matters in turn.

1. Alleged unrevealed bias.

Our review of the trial court's decision whether to grant or deny a new trial "because a juror failed to fully disclose information during *voir dire*" is narrow; we may only reverse if the trial court erroneously exercised its discretion. *State v. Wyss*, 124 Wis. 2d 681, 717-718, 370 N.W.2d 745, 762 (1985). Thus, even in criminal cases, a new trial is not required whenever a juror "answers a question dishonestly" during *voir dire*. *Id.*, 124 Wis. 2d at 724-725, 370 N.W.2d at 765-766. Rather,

a new trial may be ordered only if the following two-part test is met: "(1) that the juror incorrectly or incompletely responded to a material question on *voir dire*; and if so, (2) that it is more probable than not that under the facts and circumstances surrounding the particular case, the juror was biased against the moving party." *Id.*, 124 Wis. 2d at 726, 370 N.W.2d at 766.[6] Under the second aspect of this two-part test, the trial court's determination of whether the juror was biased against the moving party is a finding of fact that will not be reversed on appeal unless "clearly erroneous." *Id.*, 124 Wis. 2d at 732, 370 N.W.2d at 769.

The Johnsons claim that juror bias manifested itself in three respects. First, they contend that several of the jurors did not respond to questions during *voir dire* as to whether they had opinions about the effect of medical-malpractice awards on health-care costs, yet during deliberations commented that such awards

[6] *Wyss* explained that the literal honesty of a juror's response to a question on *voir dire* will not satisfy the first component of this two-part test if the "honest answer" is either "objectively incorrect" or "incomplete." *Id.*, 124 Wis. 2d at 726-727, 370 N.W.2d at 766-767.

A subjectively correct answer may well be objectively incorrect. A person may believe, given the vagueness and ambiguities inherent in language and the intelligence and education of that person, that he or she is giving an honest answer, yet that answer may be objectively incorrect. Furthermore, a person could answer a question with a response that is technically correct, but which is objectively incomplete. An incomplete answer might conceal vital information pertaining to the potential bias of a prospective juror. The correct or complete answer could suggest, in a given case, that the individual would be a biased juror.

*Id.*, 124 Wis. 2d at 727-728, 370 N.W.2d at 767 (citation and parenthetical omitted).

resulted in increased costs. Second, they argue that a juror revealed during deliberations that his father was a physician, even though the juror did not disclose that fact (if it is a fact) during *voir dire* when the jurors were asked whether any of them, "includ[ing] maybe a spouse or any real close friends," had "a job in the medical field." Third, the Johnsons allege that during deliberations a juror who worked as a nurse said that she was afraid that a finding of negligence by the jury would come back and haunt her, even though during *voir dire* she indicated that she could be fair and impartial, and, additionally, did not have a "strong feeling" as to whether medical-malpractice cases should be brought. If these allegations were presented to the trial court by competent evidence that was admissible, the first component of the two-part *Wyss* test would be met. Factual bases for these allegations, however, were proffered to the trial court only *via* juror affidavits that recounted only what was said during the course of deliberations. Although the trial court's oral decision touched upon other areas, it essentially concluded that these affidavits were not competent evidence. We agree.

RULE 906.06(2), STATS., provides:

INQUIRY INTO VALIDITY OF VERDICT OR INDICTMENT. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly

> brought to the jury's attention or whether any
> outside influence was improperly brought to bear
> upon any juror. Nor may the juror's affidavit or
> evidence of any statement by the juror concerning a
> matter about which the juror would be precluded
> from testifying be received.

RULE 906.06(2) makes incompetent evidence of what jurors say and do during deliberations, unless the evidence falls within an exception. *See State v. Marhal*, 172 Wis. 2d 491, 495-496, 493 N.W.2d 758, 761 (Ct. App. 1992). "Generally, a juror's bias or prejudice is not the type of extraneous information or 'outside influence' within the rule's exception to juror testimonial-incompetence, because the rule forbids 'an inquiry by the court into a juror's subjective motives for voting' on the verdict." *Id.*, 172 Wis. 2d at 496, 493 N.W.2d at 761 (citations omitted). An exception to this general bar is where "juror prejudice is so strong and pervasive that fundamental fairness requires that the rule of testimonial-incompetency give way." *Id.*, 172 Wis. 2d at 497, 493 N.W.2d at 761. "This requires a showing that there was ' "such a magnitude of prejudice," ' as to constitute ' "an obvious default of justice," or . . . such a "substantial likelihood" that the [moving party] was prejudiced by the influence of . . . bias in the jury room as to "offend fundamental fairness" or "violat[e] [*sic*] the plainest principles of justice." ' " *Ibid.* (citations omitted, brackets and [*sic*] in original). The Johnsons have not even come close to meeting this high burden. The affidavits recounting discussions and revelations in the jury room are thus incompetent.

2. Alleged consideration of prejudicial extraneous information.

161

An exception to the evidentiary bar interposed by RULE 906.06(2), STATS., is when the subject of the evidence is either the jury's improper consideration of "extraneous prejudicial information" or an "outside influence" that "was improperly brought to bear upon any juror." Information is "extraneous" when it "is both not of record and beyond the jurors' general knowledge and accumulated life experiences." *Marhal*, 172 Wis. 2d at 497 n.4, 493 N.W.2d at 761 n.4. An "outside influence" is one "imposed on the jury from outside by a third party." *State v. Shillcutt*, 119 Wis. 2d 788, 795, 350 N.W.2d 686, 690 (1984). The Johnsons claim four matters fall within these categories: the potential impact the verdict might have had on Dr. Agoncillo's career, the costs of health care, the nurse's concern about the possible effect a verdict might have on her, and, according to one of the juror affidavits, the discussion by some jurors during deliberations as to whether Ms. Johnson's "elective abortion started a 'chain reaction' which had something to do with causing her later premature deliveries." We discuss these matters *seriatim*.

a. Possible impact of verdict on Dr. Agoncillo's career.

This matter is not "extraneous prejudicial information"; that a physician's career might be adversely affected by a verdict finding the physician guilty of medical malpractice is not "beyond the jurors' general knowledge and accumulated life experiences." *See Marhal*, 172 Wis. 2d at 497 n.4, 493 N.W.2d at 761 n.4. Possible concern about Dr. Agoncillo's career by one or more of the jurors is also not "outside influence."

162

b. Possible impact of verdict on health care costs.

This matter is not "extraneous prejudicial information"; that money paid by an insurance company to satisfy a judgment has to come from premiums is not "beyond the jurors' general knowledge and accumulated life experiences." *See ibid.* Indeed, the subject was discussed extensively with the jury on *voir dire*. Similarly, possible concern about the costs of health care by one or more of the jurors was not "imposed on the jury from outside by a third party," and was, therefore, not an "outside influence" within RULE 906.06(2), STATS. *See Shillcutt*, 119 Wis. 2d at 795, 350 N.W.2d at 690.

c. Nurse's concern about possible effect verdict might have on her.

A juror's concern for his or her personal safety, economic security, and reputation among colleagues, friends, associates, and family should not affect his or her deliberations or vote on a verdict. Absent evidence of an external threat, however, inquiry into a juror's subjective motives for decisions made in the jury room are beyond the pale of legitimate inquiry. *See ibid.*, 119 Wis. 2d at 800-801, 350 N.W.2d at 693; *cf. United States v. Murphy*, 836 F.2d 248, 256 (6th Cir. 1988) (Fed. R. Evid. 606(b) barred inquiry into effect juror's vacation plans had on deliberations and verdict), *cert. denied*, 488 U.S. 924.

d. Discussion concerning Ms. Johnson's elective abortion.

Matters of record discussed by the jury during deliberations are neither "extraneous," *see Marhal*, 172

Wis. 2d at 497 n.4, 493 N.W.2d at 761 n.4, nor "outside influence[s]," *see Shillcutt,* 119 Wis. 2d at 795, 350 N.W.2d at 690. The Johnsons have not alleged that Ms. Johnson's elective abortion was improperly brought to the jury's attention. *Compare State v. Poh,* 116 Wis. 2d 510, 518-522, 343 N.W.2d 108, 113-115 (1984) (prior driving record of defendant). Accordingly, inquiry into this aspect of the jury's deliberation is barred by RULE 906.06(2), STATS.

The Johnsons' assertions that they are entitled to a new trial because of alleged juror misconduct are without merit.

*By the Court.*—Judgment affirmed.