Gregory G. PHELPS, Marlene L. Phelps, Estate of Adam Phelps, Deceased, by his Special Administrator, Gregory G. Phelps, and Caroline Phelps and Kyle Phelps, minors, by their Guardian ad Litem, William M. Cannon, Plaintiffs-Respondents,†

v.

PHYSICIANS INSURANCE COMPANY OF WISCONSIN, INC., a Wisconsin insurance corporation, and Matthew Lindemann, M.D., Defendants-Appellants.

Court of Appeals

*No. 03–0580. Oral argument April 7, 2004.—Decided April 27, 2004.*

2004 WI App 91

(Also reported in 681 N.W.2d 571.)

———

† Petition to review granted 9-16-04.

On behalf of the defendants-appellants, the cause was submitted on the briefs of *John S. Skilton, Chris-*

topher G. Hanewicz and *Gabrielle E. Bina* of *Heller Ehrman White & McAuliffe, LLP*, Madison; and *Michael B. Van Sicklen* and *Michael S. Heffernan* of *Foley & Lardner*, Madison. There was oral argument by *John S. Skilton* and *Michael B. Van Sicklen*.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *William M. Cannon* and *Sarah F. Kaas* of *Cannon & Dunphy, S.C.*, Brookfield. There was oral argument by *William M. Cannon*.

Before Wedemeyer, P.J., Fine and Curley, JJ.

¶ 1. FINE, J. Physicians Insurance Company of Wisconsin, Inc., and Matthew Lindemann, M.D., appeal from an "order for judgment" awarding judgment against them, jointly and severally, in this medical-malpractice case, as follows: (1) $901,015 to Gregory G. Phelps and Marlene L. Phelps; (2) $45,000 to Caroline Phelps; and (3) $45,000 to Kyle Phelps. Marlene Phelps was pregnant with Adam and Kyle when she was treated by Dr. Lindemann, who was then an unlicensed first-year resident working at St. Joseph's Hospital in Milwaukee. The Phelpses alleged, and the trial court found in a bench trial, that Dr. Lindemann negligently caused Adam's death. The trial court apportioned eighty percent of the causal negligence to Dr. Lindemann and twenty percent to St. Joseph's Hospital.

¶ 2. Physicians Insurance and Dr. Lindemann contend that the trial court erred in: (1) not giving them the jury trial they had demanded; (2) applying what they contend was the wrong standard of care in assessing whether Dr. Lindemann was negligent; (3) determining that Dr. Lindemann was not a "health care provider," as that term is used in WIS. STAT. § 146.38 (health-care-

services-review confidentiality); (4) not applying the statutory cap on damages mandated by WIS. STAT. ch. 655; (5) awarding emotional-distress damages to Mr. and Mrs. Phelps; and (6) awarding damages to Mr. and Mrs. Phelps's children for their loss of their mother's society and companionship. We agree that the trial court should have, under the facts of this case, granted the defendants' motion to extend the time within which to pay the jury fee. Accordingly, we reverse and remand for a new trial. We also address the issues that are reasonably likely to recur on remand.

## I. JURY TRIAL.

### A.

¶ 3. The Phelpses filed their amended summons and complaint naming Physicians Insurance and Dr. Lindemann on April 14, 2000.[2] On May 30, 2000, Physicians Insurance and Dr. Lindemann filed their answer, and demanded a trial by jury. On July 10, 2001, the trial court entered a standard Milwaukee County "civil division scheduling order," which provided as material to the jury-trial issue: "Jury fees must be paid in accordance with **Local Rule #371 on or before** 9-1-01 or the jury shall be deemed waived." (Uppercasing omitted; bolding in original; underlined date handwritten.) The name of Donald R. Peterson, Esq., appears on the scheduling order on behalf of

---

[2] Although parties other than Physicians Insurance, Dr. Lindemann, and St. Joseph's Hospital were named as defendants, neither those other parties nor St. Joseph's Hospital are parties to this appeal. St. Joseph's Hospital, its insurer, and the Wisconsin Patients Compensation Fund, which was also named as a defendant in both the original and amended summons and complaint, were dismissed by stipulation in July, 2001.

Physicians Insurance and Dr. Lindemann. According to the judgment roll, Peterson "appeared by phone from Philadelphia." Mary K. Wolverton, Esq., a member of Peterson's firm, Peterson, Johnson & Murray, S.C., attended the scheduling conference. The $72 jury fee was paid by letter dated September 12, 2001, which was signed by Wolverton and filed by the Clerk of Circuit Court on September 13, 2001. The letter does not indicate that a copy was sent to the Phelpses' counsel, and the parties agree that none was sent.

¶ 4. By order dated June 10, 2002, and on stipulation, Corneille Law Group, LLC, was substituted as counsel in place of Peterson, Johnson & Murray for Physicians Insurance and Dr. Lindemann. On September 11, 2002, counsel for the Phelpses, and counsel for Physicians Insurance and Dr. Lindemann filed with the trial court a "stipulation to amend scheduling order," which, among other things, set a "12 person Jury Trial" for December 4, 2002. (Bolding and uppercasing omitted.)

¶ 5. On October 29, 2002, the Phelpses' lawyer and the lawyer for Physicians Insurance and Dr. Lindemann filed with the trial court their respective proposed special jury verdicts and proposed jury instructions.

¶ 6. By letter dated December 2, 2002 (two days before the scheduled jury trial), and hand-delivered to the trial court (but mailed to the lawyer for Physicians Insurance and Dr. Lindemann), the Phelpses' lawyer wrote:

> Plaintiffs have not requested a jury trial in the above-captioned case. At no time did plaintiffs pay the jury fee. Defendants requested a jury trial in their

amended [*sic*] answer.[3] This Court's [July] 10, 2001, Scheduling Order provides that "Jury fees must be paid in accordance with Local Rule # 371 on or before <u>9-1-01</u> or the jury shall be deemed waived."

When notice was received from the Court that this case was set for a jury trial, plaintiffs' counsel believed defense counsel had paid the jury fee in accordance with this Court's Scheduling Order and Rule 371.

Plaintiffs' counsel inadvertently discovered last week that defense counsel not only failed to timely pay the jury fee, but did not notify plaintiffs' counsel of the payment. Defendants are in violation of the Court's scheduling order and Local Rule 371 on both counts. Local Rule 371 provides:

PAYMENT OF JURY FEE

Any party who has made a demand for jury trial pursuant to Sec. 805.01(2), Wis. Stats., shall have no more than thirty (30) days following the first scheduling/pre-trial conference to pay the jury fee. **Such party shall notify in writing all counsel of record and/or parties not represented by counsel of record of payment of the jury fee** or waiver of the demand for jury. Any other party shall have an additional thirty (30) days from receipt of notification of waiver to demand a jury trial and pay the jury fee. If no other party demands a jury trial and pays the jury fee within this subsequent thirty (30)-day period, it shall constitute a waiver of the right of jury trial and consent by all parties to a trial to the court sitting without a jury.

---

[3] Physicians Insurance and Dr. Lindemann demanded a jury trial in their answer to the amended complaint.

(Emphasis added.)

Defendants' failure to pay the jury fee until September 13, 2001, and not notify plaintiffs' counsel of such payment results in a waiver of their right to a jury trial. This conclusion results not only from the express language of the Scheduling Order and Local Rule 371, which reflect the provisions of 814.61(4), Wis. Stat., but the decision of several Milwaukee County judges addressing this precise issue. Several of those decisions have been affirmed by the appellate courts under the principle that the right to a jury trial, both statutory and constitutional, can be waived.[4] *See* § 805.01(3), Wis. Stat., WIS. CONST. art. I, § 5.

Given defendants' violation of the scheduling order and local rule, defendants have waived their right to a jury trial. Moreover, plaintiffs submit that a bench trial is particularly appropriate in this case given the evidence of [Physicians Insurance]'s ex parte communications and breach of privileges as well as the applicable

---

[4] At oral argument, counsel for the Phelpses explained that he was referring to circuit court decisions, at least one of which was affirmed in an unpublished decision of this court. This was entirely proper; Phelpses' counsel was not "citing" an unpublished decision of this court, *see* WIS. STAT. RULE 809.23(3) (with some exceptions, unpublished decisions of the court of appeals may not be cited), but, rather decisions of the circuit court, the citation of which is permissible, *Brandt v. Labor & Indus. Review Comm'n*, 160 Wis. 2d 353, 362–365, 466 N.W.2d 673, 676–677 (Ct. App. 1991), *aff'd*, 166 Wis. 2d 623, 480 N.W.2d 494 (1992). Moreover *it is proper to apprise court and counsel* whether the circuit court decision has been upheld, reversed, or modified on appeal. *Id.*, 160 Wis. 2d at 364, 466 N.W.2d at 677. For completeness, however, and without violating RULE 809.23(3), we note that the unpublished decision of this court, identified by counsel in response to our question, affirming a circuit-court ruling referenced in the Phelpses' December 2 letter is not material to the jury-fee-waiver issue we decide here.

standard of care for Matthew Lindemann. Therefore, plaintiffs request an order setting the case for a bench trial.

(Footnotes added; underlining and bolding by Phelpses' counsel.)

¶ 7. On December 3, 2002, the trial court held a telephone conference with the lawyers on the jury-trial issue. No testimony was taken, nor were any affidavits submitted. The trial court ruled that Physicians Insurance and Dr. Lindemann had waived their right to a jury trial, and gave the following reasons:

> This is a highly-complicated matter. I haven't been able to concentrate on anything else because of this issue now this afternoon, but that is neither here nor there. That is an aside, but the point of the matter is it's very clear in the scheduling order that if you don't pay the jury fee timely[,] which I did not know until now, the jury is waived. Gentlemen, the jury is waived. I'll see you tomorrow morning. We are trying this case to the court.

The following day, December 4, the day set for the jury trial by the scheduling order as amended by the September 11, 2002, stipulation, counsel for Physicians Insurance and Dr. Lindemann asked the trial court to extend, *nunc pro tunc,* the time for them to pay the jury fee. Peterson, their initial counsel, testified that Wolverton attended the July 10, 2001, scheduling conference because he was out of town. He explained why, in his view, the fees were not paid by the September 1 deadline:

> Since I was handling the file, Mary Wolverton returned it to me. Unfortunately, I became ill in late August, knew that I had a serious problem, turned out to be kidney cancer. I stopped — continued to do some work

but I really stopped going into the office. When they realized I wasn't coming into the office, Mary Wolverton took the file back, was going to handle it in my absence, discovered that the jury fees had not been paid on September 3, and so arranged to have the fees paid on September 12, seven business days later.

September 1, 2001, was a Saturday; September 3 was a Monday.

¶ 8. Peterson's testimony was not challenged by the Phelpses' lawyer, who asked him no questions. The trial court adhered to its view that the case should be tried to the court and not to a jury:

> Well, you know, I suppose the argument goes that I could extend the time for the jury and I guess that is the argument that is made, but there is [*sic*] a huge number of issues in this case, okay, and a lot of issues about what evidence ought to be before the trier of fact and what won't go before the trier of fact, many of which, the majority of which, as a matter of fact, have been raised by the defense and Dr. Lindemann which have complicated this case tremendously, and in my opinion, it's not a suitable place for me to exercise my discretion for those reasons. That is largely it. It's a situation of the defense's making my position. This is a time of year it's going to be very difficult to get this case in as it is before the Christmas break and, you know, given the complications that have come up in the case because of claims of — requests by the defense for motions [*sic*] in limine, requests by the plaintiffs for motions [*sic*] in limine, additional discovery and all of this, these are things the court can handle in a court trial a lot more simply and keep the case moving so we get these parties their day in court, and I — sorry, but we are going to try this case to the court, folks.

### B.

¶ 9. The right to a jury trial in civil cases is preserved by article I, section 5 of the Wisconsin Constitution, and by WIS. STAT. RULE 805.01. Both provisions, however, recognize that the right may be waived. Thus, article I, section 5 provides: "The right of trial by jury shall remain inviolate, and shall extend to all cases without regard to the amount in controversy; but a jury may be waived by the parties in all cases in the manner prescribed by law." Similarly, RULE 805.01(1) reads: "The right of trial by jury as declared in article I, section 5, of the constitution or as given by a statute and the right of trial by the court shall be preserved to the parties inviolate." RULE 805.01(3) is one provision that specifies how waiver may be effectuated:

> The failure of a party to demand in accordance with sub. (2) a trial in the mode to which entitled constitutes a waiver of trial in such mode. The right to trial by jury is also waived if the parties or their attorneys of record, by written stipulation filed with the court or by an oral stipulation made in open court and entered in the record, consent to trial by the court sitting without a jury. A demand for trial by jury made as herein provided may not be withdrawn without the consent of the parties.

Under RULE 805.01(2), parties must demand a trial by jury in civil cases "at or before the scheduling conference or pretrial conference, whichever is held first." WISCONSIN STAT. § 814.61(4) is another waiver provision:

> For a jury in all civil actions, except a garnishment action under ch. 812, a nonrefundable fee of $6 per juror demanded to hear the case to be paid by the party demanding a jury within the time permitted to demand

a jury trial. If the jury fee is not paid, no jury may be called in the action, and the action may be tried to the court without a jury.

Thus, under RULE 805.01(2) and § 814.61(4), Physicians Insurance and Dr. Lindemann had until the July 10, 2001, scheduling conference to pay the fee for the jury they demanded in their answer. Under MILWAUKEE COUNTY CIR. CT. RULE 371, they had until thirty days following the scheduling conference within which to pay the jury fee.[5] Although these provisions conflict, the conflict is immaterial here because none of the parties to this appeal contends that the scheduling order's resetting the date to September 1, 2001, was invalid. The question is thus whether the trial court erroneously denied the motion by Physicians Insurance and Dr. Lindemann to excuse the September 12 payment of the $72 jury fee.

¶ 10. Whether to forgive late payment of a jury fee is within the trial court's discretion. *Chitwood v. A.O. Smith Harvestore Prods., Inc.*, 170 Wis. 2d 622, 628, 489 N.W.2d 697, 701 (Ct. App. 1992). A court may enlarge *nunc pro tunc* the time within which a party must do something if "the court finds that the failure to act [timely] was the result of excusable neglect." WIS. STAT. RULE 801.15(2)(a) ("If the motion [to enlarge time within which to do something] is made after the expiration of the specified time, it shall not be granted unless the court finds that the failure to act was the

---

[5] As we have seen, MILWAUKEE COUNTY CIR. CT. RULE 371 provides: "Any party who has made a demand for jury trial pursuant to Sec. 805.01(2), Wis. Stats., shall have no more than thirty (30) days following the first scheduling/pre-trial conference to pay the jury fee."

result of excusable neglect."). Application of Rule 801.15(2)(a) is also within the trial court's reasoned discretion. *Hedtcke v. Sentry Ins. Co.*, 109 Wis. 2d 461, 467–468, 326 N.W.2d 727, 730–731 (1982).

¶ 11. A trial court erroneously exercises its discretion when it either ignores the governing law or misapprehends it, and our analysis of what the law requires is *de novo. F.R. v. T.B.*, 225 Wis. 2d 628, 637, 593 N.W.2d 840, 844 (Ct. App. 1999). The focus of Wis. Stat. Rule 801.15(2)(a) is "excusable neglect." Once "excusable neglect" is found, the trial court should consider the "interests of justice":

> The circuit court grants relief under sec. 801.15(2)(a) if it finds reasonable grounds for noncompliance with the statutory time period (which the statute and this court refer to as excusable neglect) and if the interests of justice would be served by the enlargement of time, *e.g.,* that the party seeking an enlargement of time has acted in good faith and that the opposing party is not prejudiced by the time delay.

*Hedtcke*, 109 Wis. 2d at 468, 326 N.W.2d at 731; *Williams Corner Investors, LLC v. Areawide Cellular, LLC*, 2004 WI App 27, ¶ 19, 269 Wis. 2d 682, 692–693, 676 N.W.2d 168, 173–174 (finding of "excusable neglect" is prerequisite to consideration of "interests of justice").

¶ 12. As we have seen, the trial court did not apply the requisite excusable-neglect standard. This was error. We therefore undertake our own review of the uncontested facts to determine whether they "provide support for the circuit court's decision." *Hedtcke*, 109 Wis. 2d at 471, 326 N.W.2d at 732. If they do not, we must reverse. *Id.*, 109 Wis. 2d at 471–472, 326 N.W.2d at

732 ("If the record indicates that the circuit court failed to exercise its discretion, if the facts of record fail to support the circuit court's decision, or if this court's review of the record indicates that the circuit court applied the wrong legal standard, this court will reverse the circuit court's decision as an abuse of discretion."). We analyze the *Hedtcke* factors in turn.

1. *Excusable Neglect.*
¶ 13. The only reason of record for the seven-business-day delay in paying the $72 jury fee was that the lawyer responsible for the file discovered that he was "serious[ly]" ill in August, 2001—that is, before the September 1 due date. As he testified: "I became ill in late August, knew that I had a serious problem, turned out to be kidney cancer." If his letting the September 1 date pass without paying the jury fee was "neglect" it certainly was "excusable."

2. *Interests of Justice.*

a. *Importance of Jury Right.*
¶ 14. The Wisconsin Constitution recognizes the "inviolate" nature of the jury-trial right. Although the trial court was concerned that the case was too complicated for a jury to understand, that a trial might be easier without a jury does not trump the constitutional guarantee; many cases present complex issues of law and fact. *See Fabrikant v. Bache & Co.*, 609 F.2d 411, 419–432 (9th Cir. 1979) (there is no complexity-exception to the Seventh Amendment to the United States Constitution), *cert. denied sub nom. Gant v. Union Bank*, 446 U.S. 929; *Kenney v. Scientific, Inc.*, 517 A.2d 484, 485–486 (N.J. Super. Ct. App. Div. 1986) (interpreting state constitution, which like article I, section 5 of the Wisconsin Constitution, provided that

683

"the right of trial by jury shall remain inviolate"); *cf. Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 42 n.4, 51–52 (1989) (Congress "lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury.").[6]

b. *Good Faith of Physicians Insurance and Dr. Lindemann.*

¶ 15. Given that the undisputed reason for the seven-business-day delay in paying the $72 jury fee was the lawyer's intervening illness, there is no evidence of bad faith in not paying the fee timely. Although the Phelpses accuse Physicians Insurance and Dr. Lindemann of "laying in the weeds" because the defendants did not tell the Phelpses that they had paid the fee on September 13, by the Phelpses' own reading of MILWAUKEE COUNTY CIR. CT. RULE 371 this should have put the Phelpses on notice that the fee had not been paid by September 1. *See* MILWAUKEE COUNTY CIR. CT. RULE 371 (party demanding a trial by jury "shall notify in writing all counsel of record . . . of payment of the jury fee"). Significantly, as we have seen, the rule does not, in so many words, require a party who demands a jury but does not pay the fee to notify opposing parties of the non-payment, although it does require such notification if the party demanding a jury subsequently decides to waive the jury-trial right. Of course, the defendants should have notified the plaintiffs when they did pay

---

[6] The Seventh Amendment to the United States Constitution " 'does not apply to the states. Nevertheless, we may be guided by the federal cases interpreting that provision.' " *Guzman v. St. Francis Hosp., Inc.,* 2001 WI App 21, ¶ 10, 240 Wis. 2d 559, 575, 623 N.W.2d 776, 784 (quoted source omitted).

the jury fee, and it would have also been better for them to seek relief under WIS. STAT. RULE 801.15(2) at that time.

c. *Prejudice to the Phelpses by the Delay.*

¶ 16. As we have seen, both parties envisioned that their case would be tried to a jury, and filed their proposed jury instructions and special verdicts. Indeed, as the Phelpses' December 2 letter admits, they did not discover until the week of November 25, 2002, that Physicians Insurance and Dr. Lindemann had not paid the jury fee timely. Presumably, the Phelpses did not discover that fact until late in the week, because they did not notify the trial court of their discovery until Monday, December 2.

■

¶ 17. For some reason not readily apparent from the record, the Phelpses preferred a bench trial to a jury trial. At oral argument, however, counsel for the Phelpses explained in response to a question that he respected the trial judge's ability to sort out the complicated and potentially confusing evidence. But one party's loss of strategic preferences cannot, standing alone, be "prejudice" so as to deprive an opposing party of the jury trial to which it is entitled. *See State v. Burks*, 2004 WI App 14, ¶¶ 15–16, 268 Wis. 2d 747, 760, 674 N.W.2d 640, 647 (criminal trial). The Phelpses were no more prejudiced by the delay in paying the jury fee than was Hyperphrase Technologies prejudiced in its Madison, Wisconsin, federal-court case against Microsoft because Microsoft missed, by four minutes and twenty-seven seconds, the deadline for it to file its motion for summary judgment. *Hyperphrase Techs., LLC v. Microsoft Corp.*, 56 Fed. R. Serv. 3d 467, 2003 WL 21920041 (W.D. WIS. 2003) (Magis. Judge).

### d. *Conclusion.*

¶ 18. All factors recognized by *Hedtcke* that entitle a party to *nunc pro tunc* relief under WIS. STAT. RULE 801.15(2)(a) are present here. Accordingly, we reverse and remand this case for the jury trial to which Physicians Insurance and Dr. Lindemann were entitled.

¶ 19. Although our resolution of an issue dispositive of an appeal would normally end matters, *see Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663, 665 (1938) (only dispositive issue need be addressed), this appeal presents other issues that have been briefed by the parties and will recur on remand. Accordingly, we analyze those issues as well. *See State ex rel. Jackson v. Coffey*, 18 Wis. 2d 529, 533, 118 N.W.2d 939, 942 (1963) (issues briefed may be considered if they may be significant on remand even though other issues are dispositive of appeal).

## II. STANDARD OF CARE APPLICABLE TO DR. LINDEMANN.

### A.

■

¶ 20. WISCONSIN STAT. § 448.01(5), as material here, defines a "physician" as a person "possessing the degree of doctor of medicine . . . and holding a license granted by the medical examining board." Although a medical-school graduate, Dr. Lindemann did not have that license. Before the Board may issue a license "to practice medicine and surgery" the applicant must, as material here, satisfy all of the following:

- be a "graduate of and possess a diploma from a medical . . . college approved by the board"; and

- have "completed postgraduate training of 12 months in a facility approved by the board."

686

WIS. STAT. § 448.05(2). Dr. Lindemann was in his twelve months of "postgraduate training" when he treated Mrs. Phelps. Thus, as the trial court found, his freedom of action was more restrictive than that of licensed physicians: He "was a first year unlicensed resident who had no authority or privileges to provide primary obstetrical care," and "was not supposed to act as the primary attending physician." Rather, again as found by the trial court, "[h]is primary duty was to assess and report findings and differential diagnoses to an upper level senior resident or to the attending obstetrician."

¶ 21. Before the trial, the parties disputed the standard of care appropriate for Dr. Lindemann. The Phelpses sought to have the standard be that of "fully licensed physicians," and wanted the trial court to instruct the jury (the jury trial was still scheduled) that "Dr. Lindemann was required to use that degree of care, skill, and judgment which is usually exercised by the average physician who provides obstetrical care." (Underlining by the Phelpses.) Physicians Insurance and Dr. Lindemann, on the other hand, asked the trial court to apply a standard of care that reflected Dr. Lindemann's status of "an unlicensed first year resident." They wanted the trial court to instruct the jury that Dr. Lindemann "was required to use the degree of care, skill, and judgment which the reasonable first year resident in his first obstetrical rotation would exercise in the same or similar circumstances, having due regard for the state of medical science at that time."

¶ 22. The trial court resolved the issue in a letter to counsel dated November 27, 2002, noting that it "agree[d] with the plaintiffs' arguments." The trial court explained:

> At the time in question, Dr. Lindemann was operating as a doctor treating an obstetrical patient. Whatever his

resident status, he saw the patient [Mrs. Phelps] three times within a critical three hour period and undertook to treat her complaints. Then, when he finally realized she could be suffering from something dangerous to her as yet unborn child, he consulted no one. During that time he assumed the mantle of a physician treating an obstetrical patient. Therefore, that must be the standard to which he is held.

In its decision finding Dr. Lindemann negligent, however, the trial court applied *both* standards of care. It found that Dr. Lindemann "was negligent in his care and treatment of Marlene Phelps and Adam Phelps under both the standard of care applicable to a first-year resident and the standard of care determined to be applicable by this court in its decision dated November 27, 2002." As noted, the trial court found Dr. Lindemann to be eighty percent causally negligent and St. Joseph's Hospital to be twenty percent causally negligent.

### B.

¶ 23. There are two problems with the trial court's legal conclusion that Dr. Lindemann was causally negligent under each of the two disparate standards of care. First, there was testimony that Dr. Lindemann complied with the standard of care applicable to first-year residents, and there is no way of ascertaining what percentage of the total negligence found by the trial court was attributable to Dr. Lindemann's violation of which standard. This uncertainty affects the appropriate level of St. Joseph's Hospital's causal negligence, which would, perforce, depend on which standard Dr. Lindemann violated. Stated another way, presumably the percentage of causal negligence attributable to Dr. Lindemann would

be greater if he were held to the higher standard of care, and lower if he were held to the lower standard of care, and St. Joseph's Hospital's percentage of causal negligence would vary accordingly. Second, the trial court's November 27, 2002, ruling conflicts with our decision in *Johnson v. Agoncillo*, 183 Wis. 2d 143, 515 N.W.2d 508 (Ct. App. 1994),[7] which is dispositive here. Thus, we do not discuss or analyze the many out-of-state cases upon which the Phelpses rely. If *Johnson*'s teaching, which we reaffirm as accurately stating Wisconsin law, is to be discarded, that must by done by the Wisconsin Supreme Court. *See Cook v. Cook*, 208 Wis. 2d 166, 189–190, 560 N.W.2d 246, 256 (1997).

¶ 24. The physician in *Johnson* undertook to treat a high-risk obstetrical patient even though he was "a family practitioner with a general medical practice." *Id.*, 183 Wis. 2d at 147, 515 N.W.2d at 510. The child was born early and suffered "from catastrophic complications of his prematurity." *Ibid.* (footnote omitted). The Johnsons contended that the trial court erred in instructing the jury that Dr. Agoncillo was "required to use the degree of care, skill, and judgment which is usually exercised in the same or similar circumstances by the average family practitioner who treats obstetrical patients having due regard for the state of medical science at the time." *Id.*, 183 Wis. 2d at 149, 515 N.W.2d at 511. The Johnsons wanted Dr. Agoncillo "held to the standard of 'the average physician who treats high risk

---

[7] We recognize that *Johnson v. Agoncillo*, 183 Wis. 2d 143, 515 N.W.2d 508 (Ct. App. 1994), was overruled *sub silentio* on other grounds by *State v. Messelt*, 185 Wis. 2d 254, 518 N.W.2d 232 (1994). *See State v. Delgado*, 215 Wis. 2d 16, 26 n.2, 572 N.W.2d 479, 483–484 n.2 (Ct. App. 1997) (recognizing that *Johnson* was overruled *sub silentio* by *Messelt*), *rev'd on other grounds*, 223 Wis. 2d 270, 588 N.W.2d 1 (1999).

obstetrical patients, rather than the average family practitioner who treats such patients.' " *Id.*, 183 Wis. 2d at 150, 515 N.W.2d at 511 (footnote omitted). We held that there was no error because in Wisconsin a physician is held to the standard of care applicable to his or her class, and not to the class of physician that the patient's condition might require. *Id.*, 183 Wis. 2d at 150–152, 515 N.W.2d at 511–512. As we explained, applying our earlier decision in *Zintek v. Perchik*, 163 Wis. 2d 439, 471 N.W.2d 522 (Ct. App. 1991), *overruled on other grounds, Steinberg v. Jensen*, 194 Wis. 2d 439, 534 N.W.2d 361:

> Contrary to the Johnsons' argument, *Zintek* did not require that physicians of one class who treat patients whose medical problems arguably require the expertise of physicians in another class conform to the standard of care applicable to that other class. Thus, for example, a cardiologist who attempts to treat a patient with cancer is, in the words of Wis JI—Civil 1023, "required to use the degree of care, skill, and judgment which is usually exercised in the same or similar circumstances by the average" cardiologist [the "specialist who practices the specialty which (<u>doctor</u>) practices"]; the cardiologist is not held to the standard applicable to oncologists. The cardiologist who negligently attempts to treat outside of his or her expertise is not, however, thereby immunized from liability. If competent evidence establishes that the average cardiologist would either refer the cancer patient to an oncologist or would consult with an oncologist, the cardiologist could be found negligent for not referring or consulting. Under the current state of Wisconsin law, however, the cardiologist is not held to an oncologist's standard of care.

*Johnson*, 183 Wis. 2d at 151–152, 515 N.W.2d at 512 (bracketing and italics in original).

¶ 25. Here, Dr. Lindemann was not a licensed physician; he was an unlicensed medical-college graduate who was undergoing his "postgraduate training of 12 months in a facility approved by the" Medical Examining Board, as a precondition to licensure. He should have been held to the standard applicable to his class. This does not mean, of course, that he automatically escapes liability. As in *Johnson*, Dr. Lindemann could be found to be negligent if he undertook to treat outside the scope of his expertise, or if the standard of care applicable to pre-licensure residents required that he either have consulted with someone more skilled, or have referred Mrs. Phelps to someone else, as the trial court found. On remand, the trial court shall instruct the jury accordingly.

III. CONFIDENTIALITY OF HEALTH-CARE-SERVICES-REVIEW INFORMATION UNDER WIS. STAT. § 146.38.[8]

A.

¶ 26. By letter dated November 30, 1998, Dennis Worthington, M.D., the chairman of the Section of Maternal Fetal Medicine at St. Joseph's Hospital, complained to Dwight Cruikshank, M.D., the chairman of the Department of Obstetrics and Gynecology at the

---

[8] WISCONSIN STAT. § 146.38 is generally referred to as a "peer review" provision. *Franzen v. Children's Hospital of Wisconsin, Inc.*, 169 Wis. 2d 366, 383–384 n.29, 485 N.W.2d 603, 609 n.29 (Ct. App. 1992), characterizes this as "not only inappropriate" but "actually misleading." Nevertheless, as we have seen in the main body of this opinion, the legislature has, itself, referred to "health care services review" as "peer review." WIS. STAT. § 655.27(1m). We refer to the statute by its formal title because it seems to be more accurate, although we recognize that titles "are not part of the statutes." WIS. STAT. § 990.001(6).

Medical College of Wisconsin, that Dr. Lindemann had "failed in a number of areas," which he specified, in connection with his treatment of Mrs. Phelps. The Phelpses sought the letter's production. Physicians Insurance and Dr. Lindemann contended that the letter was protected from disclosure by WIS. STAT. § 146.38(1m).

¶ 27. WISCONSIN STAT. § 146.38(1m) provides, with exceptions not material here, that "[n]o person who participates in the review or evaluation of the services of health care providers . . . may disclose any information acquired in connection with such review or evaluation." The initial question, therefore, is whether Dr. Lindemann is a "health care provider" under that subsection, so that Dr. Worthington's letter might qualify as a "review or evaluation" of Dr. Lindemann's "services" in connection with Mrs. Phelps. The term "health care provider" is not defined specifically by the section but, by virtue of § 146.38(1)(b), "includes an ambulance service provider, as defined in s. 146.50(1)(c), an emergency medical technician, as defined in s. 146.50(1)(e), and a first responder, as defined in s. 146.50(1)(hm)."

¶ 28. The trial court ordered the letter produced, ruling that Dr. Lindemann was not a "health care provider" under the statute. As a result, the trial court did not determine whether the letter was otherwise protected from discovery.

B.

¶ 29. Whether evidence is shielded from disclosure by WIS. STAT. § 146.38 presents a question of law subject to our *de novo* review. *Hofflander v. St. Catherine's Hosp., Inc.*, 2003 WI 77, ¶ 113, 262 Wis. 2d

539, 607, 664 N.W.2d 545, 578. Moreover, whether the privilege applies does not turn on how the professionals involved may have characterized the circumstances surrounding the evidentiary dispute. *Braverman v. Columbia Hosp., Inc.*, 2001 WI App 106, ¶ 13, 244 Wis. 2d 98, 107, 629 N.W.2d 66, 70 ("The determination of privilege is one for the courts, not for the professionals involved."). Furthermore, the party asserting that a privilege prevents the disclosure or use of evidence has the burden of proof on that issue. *Ibid.* Finally, evidentiary privileges are to be narrowly construed. *Ibid.*; *see also United States v. Nixon*, 418 U.S. 683, 709–710 (1974) (Privileges to be construed narrowly because "exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth.") (footnote omitted).

¶ 30. As noted, WIS. STAT. § 146.38 does not define specifically who is a "health care provider" as that term is used in that section. The trial court borrowed the phrase's definition from WIS. STAT. ch. 655, which governs medical-malpractice claims against health-care providers. WISCONSIN STAT. §§ 655.001(8) and 655.002(1)(a) together define "health care provider," as material here, as "[a] physician." As we have seen, a "physician" is, again as material here, "a medical . . . physician licensed under ch. 448." § 655.001(10m). WISCONSIN STAT. § 990.01(28) is similar: " 'Physician' . . . means a person holding a license or certificate of registration from the medical examining board."

■■■■

¶ 31. Dr. Lindemann was not a "health care provider" under WIS. STAT. ch. 655 because he was not yet licensed when he treated Mrs. Phelps. He and Physicians Insurance argue, however, that the definitions in

ch. 655 are, by virtue of Wis. Stat. § 655.001, meant to apply only "in this chapter," and that a more expansive reading of "health care provider" should apply under Wis. Stat. § 146.38. We agree.

¶ 32. There is no doubt but that Dr. Lindemann provided "health care" to Mrs. Phelps, although the Phelpses contend that he was, tragically, not very skilled in doing so. Indeed, although the Phelpses are not bound by this, *see Fletcher v. Eagle River Memorial Hospital, Inc.*, 156 Wis. 2d 165, 178–180, 456 N.W.2d 788, 794–795 (1990) (party not bound by concession on legal issue), one of the briefs they submitted to the trial court contended that Dr. Lindemann was liable "for any damages he caused when he provided health care to Marlene Phelps." As the trial court colorfully recognized in the course of its ruling:

> To paraphrase one of the song titles of the Andrews' Sisters of the 1940's, "Is he is, or is her ain't" a health care provider as of November 24, 1998. Common sense seems to dictate one answer, but an interpretation of Chapter 655 already led me to another answer in this case. To rule differently now, especially since sec. 146.38 contains no definition of "health care provider," would result in different rulings on the same issue in the same case. I decline to do that.[9]

(Footnote added.) Unlike ch. 655, however, § 146.38 does not exclude unlicensed medical-school graduates from its purview. A statutory provision that "includes" a list of terms in a category does not mean that the list is

---

[9] The trial court was referencing its decision on whether Wis. Stat. ch. 655's cap on noneconomic damages applied to Dr. Lindemann. We discuss that aspect of the trial court's ruling below.

exhaustive. *See National Motorists Ass'n v. Office of the Comm'r of Ins.*, 2002 WI App 308, ¶ 31, 259 Wis. 2d 240, 261–262, 655 N.W.2d 179, 188 (applying Wis. Stat. § 600.03(25)); *cf. State v. A.H.*, 211 Wis. 2d 561, 566, 566 N.W.2d 858, 860 (Ct. App. 1997) (interpreting Wis. Stat. Rule 904.04(2)). Thus, the phrase in § 146.38(1)(b) that says that the term "[h]ealth care provider includes" persons providing specified emergency health-care services is not exclusionary—other health-care providers are within its ambit. But that does not end our analysis.

¶ 33. There are two provisions in the statutes dealing with health-care services review: Wis. Stat. § 146.37, which provides that those who participate in the health-care-services-review process have, if certain criteria are met, immunity from liability for "civil damages" arising from that participation, § 146.37(1g); and, as we have seen, the confidentiality section, Wis. Stat. § 146.38. Neither defines "health care provider," however, and each has the provision that "includes" the emergency personnel that we have already seen in § 146.38(1)(b), *see* § 146.37(1)(a), which tracks § 146.38(1)(b). But the two sections are clearly tied together, and it is therefore highly significant that Wis. Stat. ch. 655 refers to one of them and uses the term "health care provider" when establishing a reimbursement mechanism for those health-care providers upon whom liability is imposed, § 146.37 notwithstanding:

PEER REVIEW ACTIVITIES. (a) The fund shall pay that portion of a claim described in par. (b) against a *health care provider* that exceeds the limit expressed in s. 655.23 (4) or the maximum liability limit for which the health care provider is insured, whichever limit is greater.

(b) A *health care provider* who engages in the activities described in s. 146.37 (1g) and (3) shall be

liable for not more than the limits expressed under s. 655.23 (4) or the maximum liability limit for which the health care provider is insured, whichever limit is greater, if he or she is found to be liable under s. 146.37, and the fund shall pay the excess amount, unless the health care provider is found not to have acted in good faith during those activities and the failure to act in good faith is found by the trier of fact, by clear and convincing evidence, to be both malicious and intentional.

WIS. STAT. § 655.27(1m) (emphasis added).

¶ 34. There are two possible consequences to the legislature's use of "health care provider" both in WIS. STAT. §§ 146.37 and 146.38, and in WIS. STAT. § 655.27(1m). On one hand, the legislature could have intended that the definition of the term be the same in the health-care-services-review sections as it is in WIS. STAT. ch. 655. On the other hand, it could have intended that the Fund be a liability umbrella for only those health-care-providers within the chapter's scope, excluding others who may fall within the broader reach of that term in the health-care-services-review sections.

¶ 35. Although the first possibility has a certain pleasing symmetry (that is, no one who may be liable for their peer-review activities is outside the Fund's umbrella), the legislature has, *in haec verba,* made the definition of "health care provider" more broad in WIS. STAT. §§ 146.37 and 146.38 than it is in WIS. STAT. ch. 655 by expanding the definition to "include[]" the emergency-care workers specified in §§ 146.37(1)(a) and 146.38(1)(b). *They* are not protected against a large civil-liability award by ch. 655's umbrella. Thus, because the definition of "health care provider" is already broader in §§ 146.37 and 146.38 than it is in ch. 655, and the legislature did not thus make the definition of

696

"health care provider" in ch. 655 congruent with those encompassed by the term in §§ 146.37 and 146.38, there is no reason not to have § 146.38's use of the phrase also cover unlicensed physicians who, as did Dr. Lindemann, provide health-care services.

¶ 36. Our conclusion that Dr. Lindemann was a "health care provider" under Wis. Stat. § 146.38 when he provided health-care services to Mrs. Phelps does not end our inquiry because there is a dispute whether Dr. Worthington's letter is otherwise protected from disclosure by § 146.38.

¶ 37. As we have seen, Wis. Stat. § 146.38(1m) provides: "No person who participates in the review or evaluation of the services of health care providers . . . may disclose any information acquired in connection with such review or evaluation." Additionally, § 146.38(2) provides:

> All organizations or evaluators reviewing or evaluating the services of health care providers shall keep a record of their investigations, inquiries, proceedings and conclusions. No such record may be released to any person under s. 804.10 (4) or otherwise except as provided in sub. (3). No such record may be used in any civil action for personal injuries against the health care provider or facility; however, information, documents or records presented during the review or evaluation may not be construed as immune from discovery under s. 804.10 (4) or use in any civil action merely because they were so presented. Any person who testifies during or participates in the review or evaluation may testify in any civil action as to matters within his or her knowledge, but may not testify as to information obtained through his or her participation in the review or evaluation, nor as to any conclusion of such review or evaluation.

" 'Evaluator' " is defined by § 146.38(1)(a) as "a medical director or a registered nurse who coordinates review of

697

an emergency medical services program of a health care provider." " 'Medical director' " is defined by § 146.38(1)(c) as having "the meaning specified in s. 146.50 (1) (j)," which defines the term as "a physician who trains, medically coordinates, directs, supervises, establishes standard operating procedures for, and designates physicians for direction and supervision of, emergency medical technicians and who reviews the performance of emergency medical technicians and ambulance service providers."

¶ 38. The statute does not define "organization." We have previously held, however, that, for the purposes of WIS. STAT. § 146.38, it is " 'a group of people that has a more or less constant membership, a body of officers, a purpose, and usu[ally] a set of regulations.' " *Franzen v. Children's Hosp. of Wis., Inc.*, 169 Wis. 2d 366, 379–380, 485 N.W.2d 603, 608 (Ct. App. 1992) (quoted source and footnote omitted).

¶ 39. Records are protected by WIS. STAT. § 146.38 from disclosure only if the following two elements are met. "First, the investigation must be part of a program organized and operated to improve the quality of health care at the hospital. Second, the organization contemplated by the statute is a group with relatively constant membership, officers, a purpose and a set of regulations." *Braverman*, 2001 WI App 106, ¶ 15, 244 Wis. 2d at 108, 629 N.W.2d at 71 (internal citation omitted). But this two-step test is only the first hurdle. Thus, § 146.38(2) protects against disclosure only records of "investigations, inquiries, proceedings and conclusions" of "organizations or evaluators reviewing or evaluating the services of health care providers." *See Franzen*, 169 Wis. 2d at 377–378, 485 N.W.2d at 607. On the other hand, "information, documents or records presented

during the review or evaluation may not be construed as immune from discovery under s. 804.10 (4) or use in any civil action merely because they were so presented." § 146.38(2); *see also Franzen*, 169 Wis. 2d at 378, 485 N.W.2d at 607. Additionally, "[a]ny person who testifies during or participates in the review or evaluation may testify in any civil action as to matters within his or her knowledge, but may not testify as to information obtained through his or her participation in the review or evaluation, nor as to any conclusion of such review or evaluation." § 146.38(2); *see also Franzen*, 169 Wis. 2d at 378, 485 N.W.2d at 607.

¶ 40. An analysis of whether WIS. STAT. § 146.38 protects against disclosure of something sought by a party requires fact-finding by the trial court. *Franzen*, 169 Wis. 2d at 381, 485 N.W.2d at 608; *see also Wurtz v. Fleischman*, 97 Wis. 2d 100, 107 n.3, 293 N.W.2d 155, 159 n.3 (1980) (court of appeals may not decide issues of fact). As we said in *Franzen*, the "trial court [must] make three distinct findings of fact":

> (1) identify those individuals preparing a record in order to determine if they are either evaluators or members of an organization "reviewing or evaluating services,"
>
> (2) determine if a record pertains to an investigation, inquiry, proceeding or conclusion of the evaluator or organization identified in step one, [and]
>
> (3) determine if a record was *presented to* the evaluator/organization or *was kept by* the evaluator/organization.

*Franzen*, 169 Wis. 2d at 381–382, 485 N.W.2d at 608–609 (footnote omitted; emphasis by *Franzen*). The

trial court should make this analysis on remand, apply the facts that it finds, and decide, independent of any legal conclusion that may be offered by any witness, whether § 146.38 applies.

IV. APPLICABILITY OF WIS. STAT. § 893.55.

¶ 41. The trial court held that the cap imposed by WIS. STAT. § 893.55(4) on noneconomic damages did not apply to Dr. Lindemann. On our independent review of that legal issue, *see Arenz v. Bronston*, 224 Wis. 2d 507, 511, 592 N.W.2d 295, 297 (Ct. App. 1999) (whether person is a "health care provider" under § 893.55 is a question of law subject to *de novo* review), we agree.

¶ 42. WISCONSIN STAT. § 893.55 has two parts. First, it establishes when "an action to recover damages for injury arising from any treatment or operation performed by, or from any omission by, a person who is a health care provider, regardless of the theory on which the action is based" may be brought. § 893.55(1)–(3). Second, it sets a limit on the "noneconomic damages," defined by § 893.55(4)(a), as "recoverable for bodily injury or death, including any action or proceeding based on contribution or indemnification . . . from all health care providers and all employees of health care providers acting within the scope of their employment and providing health care services who are found negligent and from the patients compensation fund." § 893.55(4)(b). The term "health care provider" is used both in § 893.55(1)–(2) and in § 893.55(4)(b). Ordinarily, that would mean that the phrase would have one meaning—the same in each subsection. *General Castings Corp. v. Winstead*, 156 Wis. 2d 752, 759, 457 N.W.2d 557, 561 (Ct. App. 1990). This is one of those rare instances where it does not.

700

¶ 43. In ascertaining what "health care provider" means in Wis. Stat. § 893.55(1), the main limitation-of-actions provision in § 893.55, *Clark v. Erdmann*, 161 Wis. 2d 428, 438–439, 468 N.W.2d 18, 22 (1991), held that the phrase was not ambiguous: "The term 'health care provider' in sec. 893.55, Stats., plainly applies to anyone who professionally provides health care to others." Thus, an action against a podiatrist was governed by time-limitations imposed by § 893.55. *Clark*, 161 Wis. 2d at 439–441, 468 N.W.2d at 22–23. In support of that conclusion, *Clark* also noted that podiatrists were once included within Wis. Stat. ch. 655's definition of "health care provider," *Clark*, 161 Wis. 2d at 439–440, 468 N.W.2d at 22–23, and, also, that podiatrists were licensed by the Medical Examining Board, *id.*, 161 Wis. 2d at 439, 468 N.W.2d at 22. We followed *Clark* in *Webb v. Ocularra Holding, Inc.*, 2000 WI App 25, ¶¶ 8–15, 232 Wis. 2d 495, 501–509, 606 N.W.2d 552, 556–559 (optometrist), *overruled on other grounds, Paul v. Skemp*, 2001 WI 42, 242 Wis. 2d 507, 625 N.W.2d 860; *Arenz*, 224 Wis. 2d at 512–515, 592 N.W.2d at 298–299 (chiropractor); and *Ritt v. Dental Care Associates*, 199 Wis. 2d 48, 60–64, 543 N.W.2d 852, 856–858 (Ct. App. 1995) (dentist). In all three cases, we relied, in part, on the fact that each of the professionals was required to be licensed before they could practice. *Webb*, 2000 WI App 25, ¶ 15, 232 Wis. 2d at 509, 606 N.W.2d at 559; *Arenz*, 224 Wis. 2d at 515, 592 N.W.2d at 298–299; and *Ritt*, 199 Wis. 2d at 61–62, 543 N.W.2d at 856–857.

¶ 44. This appeal does not, however, concern whether the Phelpses' action was brought timely. Rather, as material to our discussion in this part of our opinion, the dispute here centers on whether the limit on recoverable noneconomic damages applies. Significantly, there is no reason—other than, perhaps, the

arcana of the legislative process—why the time limitations in Wɪs. Sᴛᴀᴛ. § 893.55(1)–(3) and the limitations on the recovery of noneconomic damages in § 893.55(4)–(5) could not have been placed in separate sections, rather than different subsections of the same section.

¶ 45. The legislature has unambiguously declared that the cap on noneconomic damages in Wɪs. Sᴛᴀᴛ. § 893.55(4)(b) applies only to those who are health-care providers under Wɪs. Sᴛᴀᴛ. ch. 655, and to "employees of health care providers" as the phrase is further limited by § 893.55(4)(b). Thus Wɪs. Sᴛᴀᴛ. § 655.017 provides:

> The amount of noneconomic damages recoverable by a claimant or plaintiff under this chapter for acts or omissions of a *health care provider* if the act or omission occurs on or after May 25, 1995, and for acts or omissions of an employee of a health care provider, acting within the scope of his or her employment and providing health care services, for acts or omissions occurring on or after May 25, 1995, is *subject to the limits under s. 893.55(4)(d) and (f)*.

(Emphasis added.) As we have seen, Dr. Lindemann was not a "health care provider" as that term is defined by ch. 655. Similarly, § 893.55(4)–(5) (unlike § 893.55(1)–(3)), makes special reference to ch. 655.

¶ 46. First, as we have already seen, Wɪs. Sᴛᴀᴛ. § 893.55(4)(b) provides:

> The total noneconomic damages recoverable for bodily injury or death, including any action or proceeding based on contribution or indemnification, may not exceed the limit under par. (d) for each occurrence on or after May 25, 1995, from all health care providers and all employees of health care providers acting within the

702

scope of their employment and providing health care services who are found negligent *and from the patients compensation fund.*

(Emphasis added.) The "patients compensation fund" refers to the Wisconsin Patients Compensation Fund established by WIS. STAT. § 655.27. Sections 893.55(4)(e) and 893.55(5) also refer to WIS. STAT. ch. 655. Thus, § 893.55(4)(e) provides:

> Economic damages recovered under ch. 655 for bodily injury or death, including any action or proceeding based on contribution or indemnification, shall be determined for the period during which the damages are expected to accrue, taking into account the estimated life expectancy of the person, then reduced to present value, taking into account the effects of inflation.

And § 893.55(5) provides:

> Every award of damages under ch. 655 shall specify the sum of money, if any, awarded for each of the following for each claimant for the period from the date of injury to the date of award and for the period after the date of award, without regard to the limit under sub. (4) (d):
>
> (a) Pain, suffering and noneconomic effects of disability.
>
> (b) Loss of consortium, society and companionship or loss of love and affection.
>
> (c) Loss of earnings or earning capacity.
>
> (d) Each element of medical expenses.
>
> (e) Other economic injuries and damages.

The provisions in § 893.55 regulating the award of damages, including the award of noneconomic damages

are thus inextricably bound to ch. 655. As material to this appeal, the Patients Compensation Fund can be liable only for those "health care providers" who fall within the definition in WIS. STAT. § 655.001(8), and, as we have seen, Dr. Lindemann is not such a person. *See Turner v. City of Milwaukee*, 193 Wis. 2d 412, 420, 535 N.W.2d 15, 17 (Ct. App. 1995) (when statutes on the same subject conflict or are inconsistent with one another, courts must attempt to harmonize them in order to effectuate the legislature's intent).[10]

¶ 47. We recognize that the exclusion from WIS. STAT. ch. 655 of first-year residents who have their M.D. degrees but are not yet licensed, and those provisions with which that chapter is in synergy, is anomalous because they, like licensed physicians, provide health-care services to patients. But this is what the legislature has done; it can remove the anomaly if it desires. *See Clark*, 161 Wis. 2d at 439, 468 N.W.2d at 22.

V. DAMAGE AWARDS.

¶ 48. Finally, Physicians Insurance and Dr. Lindemann contend that the trial court erred in awarding to Mr. and Mrs. Phelps damages for the emotional distress they suffered as a consequence of Adam's death. They make two arguments. First, they contend correctly that WIS. STAT. ch. 655 does not permit the award of such damages. *See* WIS. STAT. § 655.017. Second, they assert that the evidence adduced at the trial does not support

---

[10] Dr. Lindemann and Physicians Insurance also argue that Dr. Lindemann should be considered to be St. Joseph's Hospital's "borrowed employee" and thus within WIS. STAT. § 893.55(4)(b) as an "employee[] of [a] health care provider[]." The trial court made no findings on that issue. As noted, we cannot find facts. The parties and the trial court are free to explore this issue on remand.

the award. We have already held in Section III of this opinion, however, that ch. 655 does not apply to medical-college graduates who are not licensed. Thus, we reject their first contention. As to their second contention, the validity of any damage award will turn on the evidence produced at that new trial.

■

¶ 49. Physicians Insurance and Dr. Lindemann also argue that the award of damages to Mr. and Mrs. Phelps's surviving children for the loss of their mother's society and companionship violates public policy. Their briefs on appeal do not, however, explain *why* that would be so, other than to set out the recognized public-policy factors without amplifying discussion. We do not decide issues that are inadequately briefed. *See Vesely v. Security First Nat'l Bank of Sheboygan Trust Dep't*, 128 Wis. 2d 246, 255 n.5, 381 N.W.2d 593, 598 n.5 (Ct. App. 1985).

## VI. SUMMARY.

¶ 50. For the reasons set out above, we conclude that: (1) the trial court erred in not giving Physicians Insurance and Dr. Lindemann the jury trial they demanded; (2) the trial court erred insofar as it determined that Dr. Lindemann was to be held to the standard of care applicable to licensed physicians; (3) further fact-finding is needed to determine whether Dr. Worthington's November 30, 1998, letter is protected from disclosure by WIS. STAT. § 146.38; (4) the trial court ruled correctly that the cap on noneconomic damages imposed by WIS. STAT. § 893.55(4)(b) does not apply here; (5) WIS. STAT. ch. 655 does not apply to Dr. Lindemann's alleged failure to properly treat Mrs.

Phelps; and (6) any decision on the appropriateness of any damage award must await the evidence adduced at the retrial.

*By the Court.*—Judgment reversed and cause remanded with directions.[11]

[11] By letter dated March 30, 2004, Dr. Lindemann and Physicians Insurance suggest that we should hold our decision in this appeal pending the Wisconsin Supreme Court's decisions in the following cases: *Maurin v. Hall*, No. 00–0072 (oral argument heard by the supreme court on April 7, 2004), and *Pierce v. Physicians Insurance Co. of Wisconsin, Inc.*, No. 01–2710 (oral argument to be heard by the supreme court on April 28, 2004). According to the supreme court's web site, the *Maurin* case will present the following issues: "Are the caps on noneconomic damages in a wrongful death case constitutional?" and "Can the plaintiffs in a medical malpractice action, where there is a death caused by medical negligence, recover both noneconomic damages for medical malpractice and wrongful death?" http://www.wicourts.gov/html/sc/SCCASES.htm. As the Phelpses point out in their letter of April 2, 2004, opposing any delay, neither of these issues were presented to the trial court in this case or argued on appeal before us.

According to the supreme court's web site, the *Pierce* case will present the following issue: "Can a mother who gave birth to a stillborn child recover 'bystander' damages under ch. 655 for negligent infliction of emotional distress, *see* Finnegan v. Wisconsin Patients Compensation Fund, 2003 WI 98, 263 Wis. 2d 574, 666 N.W.2d 797 and Bowen v. Lumbermen's Mut. Cas. Co., 183 Wis. 2d 627, 517 N.W.2d 432 (1994)?" http://www.wicourts.gov/html/sc/SCCASES.htm. Although the *Pierce* decision may impact this case, its application *vel non* will depend on the facts adduced at the trial on remand. We agree with the Phelpses that we should not hold this decision pending either *Maurin* or *Pierce*.